627 F.2d 1370
 201 U.S.App.D.C. 384
 Elliot POSTOW and Joan L. Postow
v.
OBA FEDERAL SAVINGS AND LOAN ASSOCIATION, Appellant.
Elliot POSTOW and Joan L. Postow, Appellants,
v.
OBA FEDERAL SAVINGS AND LOAN ASSOCIATION.
 Nos. 78-1892, 78-1902.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 13, 1979.
Decided June 18, 1980.
Rehearing Denied July 24, 1980.
 
 Appeal from the United States District Court for the District of Columbia (D.C. Civil Action No. 2017-73).
 Patricia D. Gurne, Washington, D. C., with whom Thomas S. Jackson and James A. Crooks, Washington, D. C., were on brief, for appellant in No. 78-1892 and appellee in No. 78-1902.
 Steven A. Skalet, Washington, D. C., with whom Benny L. Kass, Washington, D. C., was on brief, for appellee in No. 78-1902 and cross appellants in No. 78-1892.
 Before McGOWAN, LEVENTHAL* and WALD, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WALD.
 WALD, Circuit Judge:
 
 
 1
 This case involves alleged violations of Title I of the Consumer Credit Protection Act, popularly known as the Truth-in-Lending Act (the Act), 15 U.S.C. § 1601 et seq., and of the Federal Reserve Board's (Board's) implementing Regulation Z, 12 C.F.R. § 226 et seq. It arose in 1972 from Oriental Building Association's (Oriental's)[1] financing of a residential real estate loan for Elliot and Joan L. Postow.
 
 
 2
 Count II of the complaint, with which we are principally concerned here,[2] sought class certification of an allegation that Oriental had violated the Act by revealing certain fees and closing costs only at the time of the loan settlement. The Postows argued that those disclosures were required approximately a month earlier i. e., when Oriental extended a written commitment to make the mortgage loan or at least before the Postows secured that commitment by the payment of a $305 forfeitable "stand-by" fee.
 
 
 3
 The district court, 455 F.Supp. 781 (D.C.) granted the Postows summary judgment on Count II, certified the case as a class action and awarded the class statutory damages. The court also awarded the class attorneys' fees based on the time spent both on Count II and on the unsuccessful Count I. We affirm the award of summary judgment to the Postows, and we uphold the class certification and the grant of attorneys' fees. We find the amount of statutory damages awarded to the class, however, to be excessive and remand for the entry of an order modifying that portion of the judgment below.[3]
 
 BACKGROUND
 
 4
 On August 14, 1972, the Postows entered into a sales contract with a building contractor to purchase a new house in Rockville, Maryland. The contract was conditioned upon a cash down payment and the securing of a first deed of trust loan.
 
 
 5
 A few days later, the Postows applied to Oriental for a loan. On September 19, 1972, Oriental issued a "commitment letter" to the Postows in which Oriental agreed to loan the Postows the sum of $27,300 at 7 percent interest, secured by a first deed of trust on the property. The commitment was contingent upon the Postows providing the balance of the sale price at settlement and upon their timely payment of a $305.00 "stand-by" fee. Regarding that fee, the commitment letter stated:
 
 
 6
 A "Stand-By Fee" of THREE HUNDRED FIVE Dollars ($305.00) shall be paid to the Association at the time this commitment is accepted and agreed to by the applicants as evidenced by signatures hereon. The loan is to be consummated between November 6, 1972 and January 26, 1973 and if not, this fee shall be retained by the Association as fully earned for services rendered in connection with the application for loan. If the loan is consummated, the amount will be refunded.
 
 
 7
 J.A. 34. The Postows signed a copy of the commitment letter on September 26, 1972; Oriental received that signed copy and a check from the Postows for the $305 "stand-by" fee two days later. J.A. 147.
 
 
 8
 Settlement was completed on November 8, 1972. On that date, the Postows received for the first time the Truth-in-Lending disclosure statement required by the Act. The Postows executed the note, a deed of trust, and other documents necessary to convey title to the property and acknowledged receipt of the Truth-in-Lending disclosure statement at settlement.
 
 ANALYSIS
 
 9
 The Act requires the disclosure of the finance charge and the separate disclosure of all other charges imposed on the borrower by the creditor as a condition of making a loan. It also requires disclosure of any default and late payment charges imposed by the creditor. The Act was designed to promote consumers' "informed use of credit" by the "meaningful" disclosure of credit charges and terms. 15 U.S.C. § 1601 (1976). Through passage of the Act, Congress intended to enable creditors "to compare more readily the various credit terms available to (them) . . . and to avoid the uninformed use of credit." Id.
 
 I. TIME OF DISCLOSURE
 
 10
 The principal issue is whether the Act, as amplified by Regulation Z, required a written disclosure by Oriental of the terms of the credit extension at the time Oriental agreed to lend the $27,300 or at least sometime before the Postows paid the $305 forfeitable "stand-by" fee, or whether the requirements of the Act were satisfied by disclosure just prior to settlement. Section 129(a) of the Act sets forth those items that must be disclosed in an extension of consumer credit including residential mortgage loans; they include "(a)ll charges, individually itemized, which are included in the amount of credit extended but which are not part of the finance charge." 15 U.S.C. § 1639(a) (2) (1976). In the Postows' case this meant various closing costs amounting to $1,827.78.[4] Some of these closing costs, i. e., the appraisal, credit report and inspection fees (totaling $95.00) were disclosed in the commitment letter. But the Postows did not learn of the $194.50 charge for title insurance until almost two weeks after paying the "stand-by" fee, and other charges totaling $1,538.28 for title examination, survey, document preparation, real estate taxes and other settlement fees were first disclosed to the Postows on the day of settlement. The disclosure form also described for the first time at settlement two of Oriental's loan repayment policies: the "late charge" that Oriental would assess (4 percent) if the Postows' monthly payments were more than 15 days late, and the "rebate formula" Oriental would use to return unearned fire insurance premiums to the Postows if they repaid the loan before maturity.[5]
 
 
 11
 All of these charges were "included in the amount of credit extended"[6] and, along with Oriental's loan repayment policies, were required to be disclosed to the Postows under § 129 of the Act. As noted above, the issue is when those disclosures were required.
 
 A. The Language of the Act and Regulation Z
 
 12
 Section 129(b) of the Act requires that "the (aforesaid) disclosures . . . shall be made before the credit is extended, and may be made by disclosing the information in the note or other evidence of indebtedness to be signed by the obligor." 15 U.S.C. § 1639(b) (1976). Regulation Z, 12 C.F.R. § 226.8(a) (1979), interpreting that section of the Act, provides:
 
 
 13
 The disclosures shall be made before the transaction is consummated. At the time disclosures are made, the creditor shall furnish the customer with a duplicate of the instrument or a statement by which the required disclosures are made and on which the creditor is identified. All of the disclosures shall be made together on either:
 
 
 14
 (1) The note or other instrument evidencing the obligation on the same side of the page and above the place for the customer's signature; or
 
 
 15
 (2) One side of a separate statement which identifies the transaction.
 
 
 16
 (Emphasis supplied.) Regulation Z goes on to define when "the transaction is consummated" as "the time a contractual relationship is created between a creditor and a customer . . . irrespective of the time of performance of either party." Id. § 226.2(kk) (emphasis supplied).
 
 
 17
 The relevant question here is whether credit was "extended" when Oriental became obligated to make the loan and the Postows paid the "stand-by" fee which they would lose if they later decided not to borrow from Oriental. In our view, and in that of the district court whose construction of the statute we affirm, credit was "extended" at that point; a "transaction" was "consummated," a "contractual relationship" was created, and disclosure was required by the Act. Once the commitment letter was signed and the "stand-by" fee paid, Oriental could have been sued by the Postows if it refused to lend the money; the Postows would have forfeited their $305 if they had not subsequently borrowed the money from Oriental.
 
 
 18
 Oriental's arguments against this interpretation center first on language in the Act and in Regulation Z that allows the required disclosures to be made "in the note or other evidence of indebtedness to be signed by the obligor." 15 U.S.C. § 1639(b) (1976); see 12 C.F.R. § 226.8(a) (allowing disclosure in "(t)he note or other instrument evidencing the obligation"). This language is cited by Oriental to show that Congress and the Board meant only to require disclosures at some point before the ultimate sale or finance transaction is completed; in this case when both the borrower and the lender signed the mortgage note.
 
 
 19
 We disagree with that interpretation. We can find no indication that in authorizing disclosure to be made on a particular piece of paper, Congress meant to authorize by implication a timing for disclosure at odds with other more specific mandates as to when disclosure is to take place. This Act requires disclosure at the time of "extend(ing) credit," and Regulation Z mandates disclosure at the consummation of either "the" transaction (§ 226.8(a)) or "a" transaction (§ 226.2(kk)) without defining any particular transaction, and at the time of creating "a contractual relationship" (id.) without defining any particular kind of contractual relationship. Nor does Regulation Z specify that it is only the "final" loan transaction or the "final" contractual relationship legally obligating both parties to borrow and lend that creates the disclosure obligation. In fact, Regulation Z explicitly provides that a transaction is consummated when a contractual relationship to extend credit is created, "irrespective" of when the parties perform their obligations under that agreement.
 
 
 20
 The legislative history of § 129(b) of the Act is consistent with this interpretation. As introduced in 1967, the bill provided for disclosures "prior to the consummation of the transaction." S.Rep. No. 392, 90th Cong., 1st Sess. 15 (1967) (hereinafter 1967 Senate Report ). This was changed by the Senate Banking and Currency Committee to require the disclosures "before the credit is extended." Id. In addition, the Senate Report added an additional authorization for such disclosures to be put in the note or other instrument of indebtedness itself or in a separate statement,[7] still subject, however, to the major requirement that the disclosures come before the credit was "extended":
 
 
 21
 Section 4 contains the principal elements of the bill and sets forth the various disclosure requirements on consumer credit transactions. The disclosure would have to be made before the credit is extended. In most cases it would amount to providing the required information on the installment contract or other evidence of indebtedness which the consumer would sign in order to complete the transaction. A creditor could also furnish the information on a separate document, providing the information was given before the consumer actually agreed to the credit transaction.
 
 
 22
 Id. at 7 (emphasis supplied).
 
 
 23
 In providing for disclosure in the note itself as the general rule, Congress and the Board seem to have indicated that a separate, earlier notice is not required as long as the borrower receives the required disclosure before becoming liable for a significant amount if he or she does not utilize the credit. In most consumer loans, the creditor does not become liable in any way until the note is signed, and disclosure in the note would thus be sufficient. If the note is not signed until after the borrower becomes liable, however, disclosure in the note would be untimely.[8] A requirement for disclosure before the borrower becomes liable, if he or she does not utilize the credit, through payment of a substantial, forfeitable "standby" fee is therefore entirely consistent with the Act.
 
 
 24
 B. The Board Staff's Contemporaneous Construction of the Act and Regulation Z
 
 
 25
 "Public Information" letters are written by various officials and employees of the Board to inquiries regarding the statute and the Board's regulations. From June 1969 through July 1979, over 1350 of these Board staff letter responses have been made available for the staff's use and for public access in the Board's Office of Public Information; those letters are also available to the public in a commercial reporting service.
 
 
 26
 In March 1970 only months after the Act went into effect a Public Information letter written by Kenneth A. Kenyon, then the Board's Deputy Secretary, specifically addressed whether disclosures were required before the payment of a forfeitable "stand-by" fee by a borrower not contractually bound to complete the ultimate transaction:[9]
 
 
 27
 (The payment of that fee) does consummate the transaction, in that it subjects (the purchaser) . . . to a penalty for not utilizing the credit. Clearly, it creates a contractual relationship between the creditor and the customer. Accordingly, the Regulation Z disclosures must be furnished to the customer before he pays the commitment fee.
 
 
 28
 The Deputy Secretary's March 1970 letter which has been in effect almost ten years is the only administrative pronouncement directly on point. Courts frequently examine manuals, forms and advice issued to the public[10] in determining the proper construction of an administrative regulation. Further, we are not restricted to considering only the actions formally taken by the agency. Federal courts, including the Supreme Court, have given considerable weight to the practical application of a statute or regulation by government field personnel, compliance officers and auditors.[11] In fact, our own court in Bissette v. Colonial Mtg. Corp. of D. C., 477 F.2d 1245, 1246 (D.C.Cir.1973), found that the Board's Public Information letters, like the one at issue here, although not legally binding "should be treated as persuasive . . . ." Accord, McLaren v. Fleischer, supra n.11, 256 U.S. at 480-81, 41 S.Ct. at 577-78 (the "practical construction" of a statute by those charged with its execution "is entitled to great respect").[12] We thus conclude that the Deputy Secretary's March 1970 letter is highly probative on the proper construction of Regulation Z.[13]
 
 
 29
 Just this term, the Supreme Court in Ford Motor Co. v. Milhollin, 444 U.S. 555, ----, 100 S.Ct. 790, 792, 63 L.Ed.2d 22 (1980), accorded "a high degree of deference" to the Board staff's interpretations of Regulation Z in Truth-in-Lending Act cases.[14]
 
 
 30
 The Truth in Lending Act has the broad purpose of promoting "the informed use of credit" by assuring "meaningful disclosure of credit terms" to consumers. 15 U.S.C. § 1601. Because of their complexity and variety, however, credit transactions defy exhaustive regulation by a single statute. Congress therefore delegated expansive authority to the Federal Reserve Board to elaborate and expand the legal framework governing commerce in credit. 15 U.S.C. § 1604; Mourning v. Family Publications Service, Inc., 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973). The Board executed its responsibility by promulgating Regulation Z, 12 CFR Part 226, which at least partly fills the statutory gaps. Even Regulation Z, however, cannot speak explicitly to every credit disclosure issue. . . .
 
 
 31
 Id. 100 S.Ct. at 794.
 
 
 32
 In Milhollin, the Board staff had issued an official staff interpretation (which has a special status under the 1976 amendments to the Act[15]) as well as three public information letters dealing with the portions of the Act and Regulation Z at issue there. The Deputy Secretary's 1970 interpretation at issue here was necessarily unofficial, since it was issued before the 1976 amendments, thus this case is not controlled by Milhollin. But the Court also concluded in Milhollin that "wholly apart from jurisprudential considerations or congressional intent, deference to the Federal Reserve (Board) is compelled by necessity . . . ." Id. 100 S.Ct. at 798 (emphasis supplied). As the Court explained:
 
 
 33
 . . . (A) court that tries to chart a true course to the Act's purpose embarks upon a voyage without a compass when it disregards the agency's views. The concept of "meaningful disclosure" that animates TILA, see St. Germain (v. Bank of Hawaii, 573 F.2d 572 (CA9),) supra, at 577, cannot be applied in the abstract. Meaningful disclosure does not mean more disclosure. Rather, it describes a balance between "competing considerations of complete disclosure . . . and the need to avoid . . . 'informational overload.' " S.Rep. 96-73, 96th Cong., 1st Sess., 3 (1979) (accompanying S. 108, Truth in Lending Simplification and Reform Act); see S.Rep.No. 95-720, 95th Cong., 2d Sess., 2-3 (1978); Federal Reserve Board, 63d Annual Report, 326, 349-350 (1976), Comment Acceleration Clause Disclosure Under the Truth in Lending Act, 77 Colum.L.Rev. 649, 662-663 (1977). And striking the appropriate balance is an empirical process that entails investigation into consumer psychology and that presupposes broad experience with credit practices. Administrative agencies are simply better suited than courts to engage in such a process.
 
 
 34
 Id. (emphasis in original). We therefore find Milhollin at least persuasive authority for our reliance on the Board staff letter here.
 
 
 35
 Finally, our interpretation that the Act and Regulation Z required disclosure before the Postows paid the "stand-by" fee furthers the policy of the Act "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601 (1976). As this court expressly found in Bissette, "it would be preferable, from the Consumer's vantage point, to require disclosure well before the final formalities." 477 F.2d at 1247.
 
 
 36
 The realities of home financing practices underscore this concern. When a contract for the sale of a house is executed, the buyer usually leaves a forfeitable deposit with the seller to compensate for taking the house off the market until the buyer can locate the proper financing. If financing is unavailable, the buyer's deposit is typically refunded. If the buyer could obtain appropriate financing but does not, the buyer stands to lose the deposit with the seller. If disclosure is not made until the last moment before final settlement, the buyer is in a double bind and will be heavily pressured to take the credit, whatever the terms, in order not to lose both the deposit with the seller and the "stand-by" fee paid to the lender.[16] On the other hand, if the borrower learns of the lender's credit terms before putting down a substantial, forfeitable "stand-by" fee, the borrower is in a better position to reject that lender's offer and look for another in time to meet his obligations to the seller and avoid losing either a deposit or a "stand-by" fee. The policy of the Act permitting consumers to comparatively shop for credit therefore militates strongly in favor of affirming the court below.
 
 
 37
 C. The 1974 Addition and the 1976 Repeal of § 121(c) of the Act
 
 
 38
 In spite of these considerations, Oriental argues that congressional actions after the passage of the Act, the promulgation of Regulation Z, and the events in question here undercut the district court's interpretation of § 129. In 1974, two years after the Postows' home purchase, Congress added subsection (c) to § 121 of the Act to require disclosure in real estate transactions "at the time the creditor makes a commitment with respect to the transaction."[17] Shortly thereafter, Congress enacted the Real Estate Settlement Procedures Act of 1974 ("RESPA"); § 6 of RESPA required "an itemized disclosure in writing of each charge arising in connection with" the settlement of a "federally related" (i. e., federally insured) loan "at the time of the loan commitment, but in no case later than twelve calendar days prior to settlement."[18] Congress repealed both those provisions on January 2, 1976,[19] finding that "(w)hile the advance disclosure provisions of RESPA are a logical way to reach" the Act's objectives, "they are neither necessary nor as experience has borne out, desirable." H.R.Rep. No. 667, 94th Cong., 1st Sess. 4 (1975), U.S.Code Cong. & Admin.News 1975, pp. 2448, 2451.
 
 
 39
 Oriental relies on the enactments and repeals of § 121(c) and § 6 to support its restrictive interpretation of the disclosure requirements as they existed in 1972 when the Postows purchased their house. Oriental in effect argues that the 1976 repeals of § 121(c) after it had been in effect only two months and § 6 of RESPA after only seven months indicate that Congress did not intend in 1968, when it initially passed the Act, to require disclosures before final settlement of the loan transaction.
 
 
 40
 We do not agree. Even assuming later congressional action could be relied upon as an aid to interpreting the Act as it was originally passed,[20] § 121(c) and § 6 of RESPA mandated more than our holding here; they required disclosures at the time of the lender's commitment regardless of whether the buyer was required to pay a "stand-by" fee.[21] The Deputy Secretary's 1970 interpretation discussed above and this case deal with a commitment to extend credit secured by the buyer's payment of a "stand-by" fee.
 
 
 41
 We thus conclude that the repeals of § 121(c) and § 6 in 1976 do not establish that the Board exceeded its authority either in 1969 by promulgating Regulation Z, which places the time of disclosure at "consummation" of "a transaction" or when "a contractual relationship" is established, or in 1970 when the Deputy Secretary's letter interpreted that regulation to mandate disclosure before the prospective borrower puts up a forfeitable "stand-by" fee. We therefore affirm the district court's ruling on Count II that the Act required the disclosures at issue here sometime before Oriental's commitment was secured by the Postows' payment of a "stand-by" fee. That ruling implements the overriding policy of the Act to allow a borrower to compare credit opportunities; it in no way conflicts with the language of the Act; it follows the spirit of this court's earlier Bissette opinion; most important, it reflects the Board staff's interpretation of Regulation Z.
 
 III. THE ACT'S STATUTE OF LIMITATIONS
 
 42
 Section 130(e) of the Act imposes a one-year statute of limitations on actions to redress violations of the Act. The Postows accepted Oriental's loan commitment and returned a signed copy of the commitment letter to Oriental along with the $305 "stand-by" fee in late September 1972; settlement of the house sale was on November 8, 1972. The Postows filed their complaint in the district court on November 6, 1973.
 
 
 43
 Oriental argues that if the Postows' acceptance of its loan commitment and their payment of the "stand-by" fee is the point at which the disclosures required by the Act should have been made, Oriental's violation occurred in late September, 1972, more than one year before the complaint was filed. The Postows argue that a violation indeed occurred when they accepted Oriental's commitment and remitted the stand-by fee, but that the violation continued until they were provided the required disclosures at settlement, two days short of a year before the complaint was filed. The district court found in favor of the Postows on this issue, and we affirm that ruling.
 
 
 44
 Because no reported Truth-in-Lending case had dealt with this precise statute of limitations issue, the district court relied primarily on cases dealing with continuing violations in other areas of the law. It found the reasoning in those cases persuasive in light of the policies of this Act.
 
 
 45
 We agree. Hanover Shoe v. United Shoe Machinery Corp., 392 U.S. 481, 502 n.15, 88 S.Ct. 2224, 2236, 20 L.Ed.2d 1231 (1968), found that a private antitrust action, brought in 1955 and based on a continuing business practice begun in 1912, was not barred by a six-year statute of limitations because the challenged conduct "constituted a continuing and accumulating harm on Hanover." Accord Katz v. NLRB, 196 F.2d 411, 415 (9th Cir. 1952) (continuing unfair labor practice); Schokbeton Products Corp. v. Exposiac Industries, Inc., 308 F.Supp. 1366, 1367-68 (N.D.Ga.1969) (continuing antitrust violation). We find the analogy persuasive. The Postows' payment of the forfeitable "stand-by" fee without having the Act's required disclosures before them inhibited them from "compar(ing) more readily the various credit terms available" and it prevented them from "avoid(ing) the uninformed use of credit," 15 U.S.C. § 1601 (1976), thus subverting the announced goals of the Act.
 
 
 46
 We do not think that this recognition of the nondisclosure violation as a continuing one is at all inconsistent with our principal holding that disclosure must occur before the "stand-by" fee is paid. The borrower in a situation like that presented here retains legal freedom to change his or her mind on taking the lender's credit up to the time the note is signed. If the nondisclosures are viewed as serious enough, however, the borrower may well renege and be required to forfeit the fee. Furtherance of the goals of the Act thus mandates both a requirement of disclosure before the "stand-by" fee is paid and recognition that if disclosure is not then made, the violation continues up to the time of settlement.[22] We therefore conclude that the district court's interpretation of the Act's statute of limitations is entirely consistent with the Act's remedial purposes.[23]
 
 IV. CLASS CERTIFICATION
 
 47
 Oriental objects to the class certification on the ground that the district court abused its discretion by relying solely on the Postows' allegations that a class action was appropriate. Oriental also alleges that the court erred as a matter of law in not later vacating the certification as improper since the final designation of the class and the sending of notice to the members occurred after the court granted the Postows' motion for summary judgment.
 
 
 48
 We find the district court's class certification to have been a proper exercise of its discretion[24] and, although the question of the propriety of class certification after a judgment on the merits in favor of the class is a difficult one, our close scrutiny of the unique sequence of the proceedings in the court below convinces us that no error was committed in the court's refusal to vacate its certification. Since the latter is by far the more significant challenge and since we expressly limit our holding to the facts of this case, we discuss Oriental's second argument at some length.
 
 
 49
 A. The Law on Post-Judgment Class Certification
 
 
 50
 Count II of this case was certified as a Rule 23(b)(3) class action i. e., one in which "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members . . . ." Rule 23(c)(2) states that, in Rule 23(b)(3) class actions, each potential member of the class must be notified that he or she will be excluded from the class upon request by a specific date and that the judgment, "whether favorable or not," will include all class members not choosing to be excluded. Pursuant to Rule 23(c)(3), the judgment in a class action "shall specify or describe" those members who received notice and did not opt for exclusion from the class.
 
 
 51
 Subsections (b)(3) and (c)(3) were added to Rule 23 in 1966, as the Rules Advisory Committee explained, to avoid "one-way" intervention i. e., allowing members of a Rule 23(b)(3) class the option of joining an action as plaintiffs after a favorable judgment on the merits while avoiding the res judicata effect of an adverse decision by not joining if the named plaintiffs have been unsuccessful. See 39 F.R.D. at 105.
 
 
 52
 The notice provisions of Rule 23 were discussed in Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 176, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974). That case involved the question whether the costs of notifying class action plaintiffs could be shifted to the defendant. The Court held that notification costs could not be shifted and found improper the district court's holding of a pre-judgment "mini-hearing" on the merits of a class action to apportion those costs between the parties. As part of its reasoning, the Court suggested the representative plaintiff "is thereby allowed to obtain a determination on the merits of the claims advanced on behalf of the class without any assurance that a class action may be maintained." Id. at 177-78, 94 S.Ct. at 2152.
 
 
 53
 Some courts subsequently construed Eisen and the requirements in Rule 23(c) to prohibit class certification and the sending of notice to a Rule 23(b)(3) class after, or simultaneously with, a decision on the merits of a case. E. g., Horn v. Associated Wholesale Grocers, Inc., 555 F.2d 270, 273-75 (10th Cir. 1977); Peritz v. Liberty Loan Corp., 523 F.2d 349, 352-54 (7th Cir. 1975). Those cases echo the Advisory Committee's 1966 concern about allowing potential class plaintiffs to choose whether to join an action after the merits have been decided, since they can opt to be bound by the judgment if it is favorable to the class, or not to be bound if the plaintiffs have lost.
 
 
 54
 These counts extrapolated from the suggestions in Eisen regarding the potential problems with post-judgment class certification. In fact, however, Eisen indicates that the plaintiffs there could have continued with their class action, despite the impropriety of the district court's mini-hearing, if they had notified the members of the class rather than attempted to shift part of the notification burden to the defendant. 417 U.S. at 179 & n. 16, 94 S.Ct. at 2153 & n.16. Despite its rhetoric, the Eisen Court itself was thus not unduly concerned about class members joining after learning of the trial judge's view of the merits.
 
 
 55
 Other courts have expressly held that a defendant may waive the protections Rule 23(c) offers and elect to have the merits decided before the class certification question and before notice is sent to the class when, as here, the defendant moves for summary judgment before resolution of the certification issue. E. g., Katz v. Carte Blanche Corp., 496 F.2d 747, 757-62 (3d Cir. 1974) (en banc ), cert. denied, 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1975); Torosian v. National Capital Bank of Washington, 411 F.Supp. 167, 169-71 (D.D.C.1976); Haas v. Pittsburgh Nat'l Bank, 381 F.Supp. 801 (W.D.Pa.1974), rev'd on other grounds, 526 F.2d 1083 (3d Cir. 1975).[25]
 
 
 56
 We find the reasoning of those opinions instructive. The Haas court noted, for example, that the strongest argument for construing Eisen to preclude post-judgment class certification is that pre-judgment certification and notice to the class are necessary to protect the defendant from future suits by potential members of the class. But that rationale disappears when the defendant himself moves for summary judgment before a decision on class certification. In such a situation, "the defendants . . . assume the risk that a judgment in their favor will not protect them from subsequent suits by other potential class members, for only the slender reed of stare decisis stands between them and the prospective onrush of litigants." Haas, supra, 381 F.Supp. at 805.
 
 
 57
 More recent Supreme Court decisions have provided for appeal of a Rule 23(b) (3) class certification denial after a decision on the merits of an action. A necessary corollary to those cases is that if the denial of the class certification is reversed and remanded, the class may be certified after the entry of judgment. Those cases therefore demonstrate the Court's tolerance for allowing, in appropriate circumstances, potential class members the option of joining an action after the trial court has passed on the merits of the basic claim.
 
 
 58
 In United Airlines, Inc. v. McDonald, 432 U.S. 385, 97 S.Ct. 2464, 53 L.Ed.2d 423 (1977), for example, the Court held that a member of the putative class could intervene to appeal a class certification denial after a judgment on the merits favorable to the named plaintiffs individually. The McDonald majority expressed no concerns about the possibility of prejudice to the defendant even though Mr. Justice Powell dissented on the ground that the potential class member's delay in seeking intervention "was especially costly in this case." Id. at 401 n.4, 97 S.Ct. at 2473 n. 4 (Powell, J., dissenting).[26] The next year in Coopers & Lybrand v. Livesay, 437 U.S. 463, 469, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978), a Rule 23(b)(3) case,[27] the Court refused to allow prejudgment appeal of a class certification denial since, under McDonald, "an order denying class certification is subject to effective review after final judgment at the behest of the named plaintiff or intervening class members."
 
 
 59
 Just this term in Deposit Guaranty National Bank of Jackson, Miss. v. Roper, 445 U.S. 326, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980), expressly involving Rule 23(b)(3), the Court extended this toleration even further. Relying upon McDonald and Coopers & Lybrand, the opinion of the Chief Justice for the Roper majority found that the district court's entry of judgment, based on a settlement offer, in favor of the named plaintiffs individually after denying them class action status did not render moot their appeal of the class certification denial.[28] See also United States Parole Commission v. Geraghty, 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980).[29]
 
 
 60
 Thus the present state of the law does not necessarily preclude class certification after a judgment on the merits in Rule 23(b)(3) class actions; it suggests there may be equitable reasons for allowing post-judgment certification in some cases. We believe this is such a case. The class was originally certified before summary judgment was granted to the Postows on Count II (though the members of the class were not correctly identified and notified until after then); Oriental moved for summary judgment after the Postows had agreed to stay discovery on the identity of the potential class members only until a decision on Oriental's motion to dismiss; and the notice to potential class members did not inform them as to the existence of any judgment in their favor, thus reducing substantially the "one way street" danger of post-judgment certifications.[30] We do not intend to establish an inviolable rule for future cases, but taking the complicated sequence of events in this case into consideration, we do not find that the trial court abused its discretion in managing the case as it did with regard to the timing of class certification.
 
 V. STATUTORY DAMAGES
 
 61
 Oriental argues that the damages awarded to the class are excessive in light of the peculiar circumstances of the violation. We agree and for the reasons set out below modify that award.
 
 
 62
 Section 130 of the Act provides that creditors which violate any of its requirements are liable either for actual damages or for specified statutory damages. 15 U.S.C. § 1640 (1976). Since the class here stipulated it suffered no actual damages, we are concerned only with the Act's provisions for statutory damages.
 
 
 63
 For individual actions, § 130 limits statutory damages to twice the amount of the nondisclosed finance charge, with a minimum recovery of $100 and a ceiling of $1,000. Id. § 1640(a)(2)(A). For class actions, the allowable statutory recovery is "such amount as the court may allow." Id. § 1640(a)(2)(B). There is no minimum statutory recovery for class actions, but § 130 of the Act sets the maximum at the lesser of $100,000 or one percent of the creditor's net worth. Id. In setting class action awards the district court is specifically directed to
 
 
 64
 . . . consider, among other relevant factors, the amount of any actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the creditor, the number of persons intentionally affected, and the extent to which the creditor's failure of compliance was intentional.
 
 
 65
 Id. § 1640(a).
 
 
 66
 As the Senate Banking, Housing and Urban Affairs Committee noted in reporting on amendments to § 130 in 1973, the purpose of the Act's civil remedies provisions was "to provide a meaningful incentive to comply with the law without relying upon an extensive new bureaucracy." 1973 Senate Report at 15. Most violations of the Act do not involve actual damages; "some meaningful penalty provisions are therefore needed to insure compliance." Id. (citations omitted). We thus reject, as did the district court, Oriental's argument that the award of any statutory recovery in the absence of actual damages would be punitive and justified only for brazenly willful violations or to restrain continuation of unlawful practices. Accord, Hinkle v. Rock Springs Nat'l Bank, 538 F.2d 295, 297 (10th Cir. 1976); cf. Little Redhouse v. Quality Ford Sales, Inc., 523 F.2d 1, 2 (10th Cir. 1975) (en banc ). Nevertheless, given the facts of this case, we conclude that the district court acted outside the range of its discretion in arbitrarily setting one-half of the maximum possible recovery as the measure of statutory damages here.
 
 
 67
 The district court considered each of the factors enumerated in § 130 as relevant to class action awards. First, the court acknowledged that the lack of actual damages militated against a high award, but concluded that whether the lack of actual damages "should be given overriding weight in this action can only be determined after consideration of the other relevant factors." J.A. 318.
 
 
 68
 It then considered the "frequency and persistency" of Oriental's violations and whether they were "intentional." The record indicates that Oriental's practice was to provide the Act's required disclosure statement on the day of settlement or in some cases before that time, but after the purchasers had signed the commitment letter and returned it to Oriental along with the "stand-by" fee. On that basis, the district court found that Oriental's violations of the Act's disclosure requirement were frequent and persistent. On the other hand, the district court found "there is no evidence that defendant wilfully intended to deceive consumers in violation of the Act." J.A. 319.
 
 
 69
 We agree with the district court that evidence of a defendant's predominant practice is relevant to the frequency and persistence of a violation and may be relevant to the defendant's intent. But if the defendant did not "persist" in the violations by "wilfully" continuing them after it knew or should have known they were proscribed by the Act, the frequency of the violation is less important. The record here is uncontradicted that Oriental received no oral or written objections to its disclosure policy until the Postows filed their complaint in November 1973. Furthermore, as even the district court recognized, a large award of damages would not act as a deterrent to the disclosure violations because, at least as of November 1976, the last home loan commitment Oriental had issued was in May 1973.
 
 
 70
 The first indication, apart from the 1970 interpretation of the Federal Reserve Board's Deputy Secretary discussed above, that the Act's disclosures were required at commitment (so long as a stand-by fee was paid) was arguably this court's Bissette opinion which issued five months after the actions giving rise to the Postows' complaint. Although we do not countenance Oriental's apparent disregard of, or at least unfamiliarity with, that 1970 interpretation, we do recognize its relative obscurity among the hundreds of Public Information letters. We can find on this record no other possible indication of persistent, willful violation of the Act.
 
 
 71
 As the district court concluded, other possible relevant factors i. e.., the extent of Oriental's resources and the number of persons adversely affected by its actions "do not weigh heavily toward exacting a severe penalty from the defendant." J.A. 320. Oriental's net worth as of December 1976 was only $4.4 million. Furthermore, a majority, 64, of the 105 members of the class chose to be excluded.[31] The district court also noted that the members of the class Oriental deposed "do not seem to feel that they have been the victims of deception by the defendant." Id.
 
 
 72
 To summarize, there are five factors relevant to the class action award here: (1) the absence of actual damages, (2) the frequency and persistence of Oriental's actions, (3) Oriental's resources, (4) the number of people adversely affected, and (5) whether Oriental acted intentionally. The court below found only the "frequency and persistence" standard weighed in favor of a substantial award for the class, but it nevertheless awarded one-half of the statutory maximum recovery, $22,350.42.[32] That amounts to more than $545 for each of the 41 members of the class who chose not to be excluded.
 
 
 73
 We conclude that the district court abused its discretion in awarding one-half of the statutory maximum in the face of its own finding that only one of the factors specified in the statute as justifying a substantial award was involved in this case. In most instances we would remand to the district court for a redetermination of the appropriate statutory damages for the class since we should assume that responsibility ourselves only in extraordinary circumstances. However, as a federal appellate court, we have specific statutory authority to "affirm, modify, vacate, set aside or reverse any judgment, decree or order of a court" properly before us and to remand "and direct the entry of such appropriate judgment . . . as may be just under the circumstances." 28 U.S.C. § 2106 (1976) (emphasis supplied). When there are "guidelines establishing the basic elements of the award," as in this case, making it as easy for the appellate court to compute damages as the trial court, modification of a damage award on appeal is appropriate Simpson v. United States, 322 F.2d 688, 693-94 (5th Cir. 1963).[33]
 
 
 74
 We conclude that a reduction of the statutory damages award is appropriate here. There are specific statutory factors or guidelines which must be considered in class action damage awards under the Act, and there are no material disputed issues of fact as to how those guidelines apply here. Furthermore, a remand would unduly delay final resolution of this seven year old controversy. Finally, the district judge who handled this matter for more than four years, and who we would presume to be in a better position than we to exercise discretion over an award of damages because of his familiarity with the parties and the case, has unfortunately died since issuing the opinion and orders now under review. Any district judge to whom the case might be assigned on remand would be no more familiar with the case than we are, therefore a major reason for our usual deference to a district judge's reevaluation of damages on remand is not present. We emphasize that we are not establishing any precedent for appellate redetermination of statutory damage awards under the Act that goes beyond the special facts and circumstances here.
 
 
 75
 Because only one of the factors enumerated in the Act augurs for an award of any damages, we modify the district court's award of one-half of the maximum statutory recovery to a sum that allows the same recovery as the statutory minimum of $100 per person for individual actions, a total of $4,100. Under the circumstances here, we think that is the most equitable way to compute an award of statutory damages.
 
 VI. ATTORNEYS' FEES AND OTHER COSTS
 
 76
 Section 130(a)(3) allows the recovery, "in the case of any successful action to enforce . . . (the Act, of) the costs of the action, together with a reasonable attorney's fee as determined by the court." 15 U.S.C. § 1640(a)(3) (1976) (emphasis added). There is no provision for the recovery of attorneys' fees by lenders who successfully defend actions brought under the Act. The court below awarded $18,150.05 of the $21,452.25 attorneys' fees the Postows sought as representatives of the class but denied the recovery of $1,731.09 in deposition costs, expert witness fees and miscellaneous expenses.
 
 
 77
 Oriental challenges the attorneys' fee award on two principal grounds: (1) Section 130's allowance of attorneys' fees for successful borrowers but not creditors is an unconstitutional denial of due process and equal protection, both on its face and as applied here; and (2) the class should not be awarded attorneys' fees for time spent on Count I, the issue on which Oriental was awarded summary judgment.[34] As discussed below, we reject each of Oriental's arguments and affirm the lower court's award of attorneys' fees. We also reject the Postows' objections to the district court's denial of the recovery of expert witness fees and miscellaneous costs, and affirm those actions of the court as well, but we remand for the determination and possible award of deposition fees.
 
 
 78
 The district court ruled correctly that the creditor/debtor relationship at issue here involves no "fundamental" interest of creditors in securing their debts, and the statute does not create a suspect classification of lenders that can only be upheld in the face of a compelling governmental interest. See United States v. Kras, 409 U.S. 434, 445-46, 93 S.Ct. 631, 637-38, 34 L.Ed.2d 626 (1973). Thus, only a rational justification need exist for the Act's distinction between successful borrower and lender litigants.[35]
 
 
 79
 The legislation at issue here was specifically designed by Congress to be enforced through private citizen suits. See 1973 Senate Report at 14; McGowan v. Credit Center of North Jackson, Inc., 546 F.2d 73, 77 (5th Cir. 1977); Sosa v. Fite, 498 F.2d 114, 121 (5th Cir. 1974). The district court correctly relied upon Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978), and Alyeska Pipeline Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed. 141 (1975), in concluding that the interest in such private enforcement constitutes a rational basis for a legislative distinction to be drawn between attorneys' fee awards to successful plaintiffs but not successful defendants.
 
 
 80
 The district court also correctly rejected Oriental's argument that the award of attorneys' fees to the Postows should be reduced because they were unsuccessful as to Count I. The Postows argued in Count I that Oriental's requirement of owners' title insurance was illegal, but they did not indeed under the Act they could not attack that requirement directly. The Act only requires the disclosure of lending costs to borrowers; it neither prohibits nor allows charges of any kind.
 
 
 81
 Thus, the gravamen of the Postows' complaint in Count I was not that Oriental required owners' title insurance but rather that Oriental failed properly to disclose that requirement to them.[36] Count II of their complaint similarly alleged a violation of the Act's disclosure requirements regarding charges for six types of closing costs the Postows learned of only at settlement.[37]
 
 
 82
 Oriental attempts to argue that two separate injuries were alleged here, relying, inter alia, on the fact that the Postows chose to describe their assertions in separate counts. In fact, this lawsuit was but a single "action" within the meaning of § 130(a)(3). It was, in substance, a claim that Oriental failed to properly disclose required charges, in a single transaction, leading to a single injury (the inability to "shop around" for better terms) and resulting in a right to a single recovery. Indeed, § 130(g) of the Act makes explicit the plaintiffs' limitation to a single claim for recovery, no matter how varied the violations:
 
 
 83
 The multiple failure to disclose to any person any information required under this part . . . of this subchapter (which includes § 129) to be disclosed in connection with a single account under an open end consumer credit plan, other single consumer credit sale, consumer loan, consumer lease, or other extension of consumer credit, shall entitle the person to a single recovery under this section . . . .
 
 
 84
 15 U.S.C. § 1640(g) (1976) (emphasis supplied).
 
 
 85
 In this case, Counts I and II alleged "multiple failure(s)" to disclose costs but these multiple failures gave rise to grounds only for a single "action" alleging a right to recover statutory damages. As the district court noted, had the Postows prevailed on Count I, they could not have been more "successful" in their pursuit of damages then they were on the basis of Count II. We therefore conclude that the district court did not err in awarding reasonable attorneys' fees based on the time spent litigating Count I as well as Count II.[38]
 
 
 86
 We note that the only other court of appeals to have addressed this issue agrees with our conclusion, although on different grounds. In McGowan, supra, the court of appeals vacated and remanded a district court decision which substantially reduced a request for attorneys' fees in a Truth-in-Lending case "because the plaintiff's attorney had been successful 'in only one minor charge.' " We agree with the Fifth Circuit's conclusion in McGowan that the enforcement of this Act should not be so restricted, because of its purpose:
 
 
 87
 The Congressional goals underlying the Truth-in-Lending Act include the creation of a system of private attorneys general to aid in effective enforcement of the Act. Sosa v. Fite, 498 F.2d 114, 121 (5th Cir. 1974); Thomas v. Myers-Dickson Furniture Co., 479 F.2d 740, 748 (5th Cir. 1973). The reduction of an award of attorney's fees from the amount sought solely because the plaintiff was successful on only one of the several charges would be inconsistent with the Congressional policy of implementing enforcement of the Truth-in-Lending Act. See Sellers v. Wollman, 510 F.2d 119 (5th Cir. 1975).
 
 
 88
 Id.
 
 CONCLUSION
 
 89
 For the foregoing reasons, we affirm the court below insofar as it awarded summary judgment to Oriental on Count I and to the Postows on Count II. We also affirm the district court's decision on the statute of limitations issue, its certification of Count II as a class action, as well as its award of attorneys' fees and the denial of the Postows' claim for reimbursement of expert witness fees and miscellaneous costs. We reverse the district court's award of statutory damages, however, and remand for the entry of judgment in the amount of $100 for each of the 41 members of the class and for an appropriate determination on the Postows' claim for reimbursement of deposition costs.
 
 
 90
 Affirmed in part, reversed in part, and remanded.
 
 
 
 *
 Circuit Judge LEVENTHAL, a member of the panel which heard oral argument in this case, died before the case was decided
 
 
 [1]
 Oriental is now known as OBA Federal Savings and Loan Association, but for consistency's sake it will continue to be referred to in this opinion as Oriental
 
 
 [2]
 The Postows alleged in Count I that Oriental violated the Act by not separately listing the fee for owners' title insurance, which Oriental required as a condition of making the loan, in the computation of the finance charge pursuant to § 106 of the Act, 15 U.S.C. § 1605 (1976). The trial court granted summary judgment to Oriental on this count, and we affirm that portion of its decision
 Section 106(e) of the Act expressly exempts "title insurance" from those costs which must be included in the finance charge, but the Postows attempt to draw a distinction between "owners' " title insurance and "lender's" title insurance, arguing that only the latter is included in the exemption. We can see no basis in language, logic or the law for such a distinction.
 Alternatively, the Postows argue that Oriental's requirement of owners' title insurance violated state law. As interpreted by the Board, charges for requirements imposed in violation of state law are not bona fide; Regulation Z has interpreted § 106(e) to exempt only charges which are bona fide; therefore the Postows again argue that the charge was not exempt under § 106(e) and should have been separately disclosed as part of the finance charge. Maryland law, however, only prohibits a requirement that insurance be purchased from a particular agency or broker ; it does not prohibit a requirement that insurance be purchased. Md.Ann.Code, art. 48A, § 228(a). The evidence in the record establishes that the Postows were free to purchase owners' title insurance from any agent they wished. Thus the Maryland law was not violated by Oriental's requirement, and the necessary premise of the Postows' argument fails.
 
 
 [3]
 We also remand for the possible redetermination and award of certain deposition fees. See note 38, infra
 
 
 [4]
 These closing costs were "included in the amount of credit extended" under § 129(a) because Oriental effectively loaned the Postows the money to pay the closing costs as well as the balance due on the house. The Postows agreed to repay Oriental $27,300 over 30 years but they actually received only $25,355.44 ($27,300 minus the $1,827.78 in closing costs and $116.78 in prepaid finance charges) from Oriental to use in buying their house
 
 
 [5]
 The largest closing cost was $1,193.78 for real estate taxes which would not have changed if the Postows had chosen a different lender, but other lenders may have had different policies on the timing of the real estate tax payment and some might have let the Postows pay those taxes on their own. There were also $344.50 in other closing costs and the late charge and rebate formula that might well have varied among lenders. We need intimate no view on whether the $344.50 in closing costs or Oriental's late charge and rebate formula were reasonable, but note only that had those charges and policies been disclosed to the Postows before they signed the commitment letter and paid their $305 "stand-by" fee, they might have decided to continue shopping for more favorable terms. Oriental could have estimated the $344.50 in closing costs if they could not be determined with precision at the time of commitment. 12 C.F.R. § 226.6(f) (1972). Additionally, Oriental's policies regarding late fees and rebates were presumably already established at the time of commitment. Thus, Oriental's ability to have disclosed those charges and policies at commitment is not at issue
 
 
 [6]
 See note 4, supra
 
 
 [7]
 The only reason offered by the Senate Committee for this provision was that it "obviates the need for a separate piece of paper showing the disclosure terms." 1967 Senate Report at 15. The House Report merely cited that same rationale:
 Disclosures must be made before the credit is extended; this may be done in the contract or other document to be signed by customer, thereby obviating any need for disclosure on a separate piece of paper.
 H.R.Rep. No. 1040, 90th Cong., 1st Sess. 25 (1967).
 
 
 [8]
 Because Foster v. Maryland State Savings & Loan Association, 369 F.Supp. 843, 845 (D.D.C.1974), aff'd on other grounds, 590 F.2d 928 (D.C.Cir.1978), did not discuss the "stand-by" fee situation presented here, its conclusion that disclosure at any time before actual execution of a mortgage "is all that is required" does not contribute to our analysis of this case. Waters v. Weyerhaeuser Mortgage Co., 582 F.2d 503, 505 (9th Cir.1978), which held that disclosures at the time of closing satisfy the Act, did not involve a loan in which a commitment fee had been paid by the borrower. In fact, the Ninth Circuit there distinguished the district court's opinion in this case on that ground, id. at 506, acknowledging that a different question is presented when such a fee is paid. See also Harvey v. Housing Devel. & Info. Cent., 451 F.Supp. 1198 (W.D.Mo.1978) (no commitment fee); Copley v. Rona Enterprises, Inc., 423 F.Supp. 979 (S.D.Ohio 1976) (same)
 
 
 [9]
 Excerpts from FRB letter of March 6, 1970, by Kenneth A. Kenyon, Deputy Secretary (1969-1975 Transfer Binder) Cons.Cred. Guide (CCH) P 30,322 (1970)
 
 
 [10]
 See, e. g., Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 417-18, 65 S.Ct. 1215, 1218-19, 89 L.Ed. 1700 (1945); Standard Oil Co. v. DOE, 596 F.2d 1029, 1052-56 (Em.App.1978); United States v. Standard Oil Co. of Cal., 270 F.2d 50, 56-58 (2d Cir. 1959); Thomas v. County Office Comm., 327 F.Supp. 1244, 1258 (S.D.Texas 1971); Shaeffer v. Fraser-Brace Eng'r Co., 104 F.Supp. 871, 873 (N.D.Tenn.1952); Byrne v. Metcalfe Constr. Co., 99 F.Supp. 635, 638 (D.Neb.1951)
 
 
 [11]
 McLaren v. Fleischer, 256 U.S. 477, 480-81, 41 S.Ct. 577, 577-78, 65 L.Ed. 1052 (1921); Standard Oil Co. v. DOE, supra, n.11, 596 F.2d at 1056; Willamette Valley Lumber Co. v. United States, 252 F.Supp. 199, 205-06 (D.Or.1966)
 
 
 [12]
 We also held in Bissette that "(a)ny lingering ambiguity in the statute is eliminated by the relevant regulations promulgated by the Federal Reserve Board under its authority to interpret and implement the Act." We concluded that "the applicable and binding regulations" require disclosure "prior to the existence of a contractual relationship between borrower and lender" and remanded for a determination of the "essential issue" whether such a relationship existed at the time of the loan commitment under the facts in that case. 477 F.2d at 1248. One district court later followed Bissette in finding disclosure necessary at the payment of a fee similar to the "stand-by" fee the Postows paid here. Hardin v. Cliff Pettit Motors, Inc., 407 F.Supp. 297, 299 (E.D.Tenn.1976)
 
 
 [13]
 For example, notwithstanding a regulation that limited authorized interpretations to those "issued by specially designated (agency) officials," the Bowles Court looked both to the practical explanation of the regulations in a publicly distributed pamphlet and to "countless explanations and interpretations given to inquirers." 305 U.S. at 417-18, 65 S.Ct. at 1219
 
 
 [14]
 We noted in Bissette : "The Board has broad power to implement the Act, power delegated to it by a Congress which was uncertain as to the refinements potentially required to implement successfully its novel statutory scheme." 477 F.2d at 1247. Milhollin strongly reinforces those views
 
 
 [15]
 In 1976, § 130(f) of the Act, 15 U.S.C. § 1640(f) (1976), was added, providing an explicit "good faith" defense for reliance on formal Board opinions and those the Board has designated formal staff interpretations. Regulation Z now provides that "(u)nofficial staff interpretations will be issued at the staff's discretion where the protection of section 130(f) of the Act is neither requested nor required, or where a rapid response is necessary." 12 C.F.R. § 226.1(d)(1) (1979). "Official staff interpretations will be issued at the discretion of designated officials." Id. § 226.1(d)(2)
 The staff continues to respond by correspondence to specific requests for guidance. Since the addition of § 130(f) to the statute, however, such correspondence typically contains this caveat: "This is an unofficial staff interpretation of Regulation Z, limited in its applicability to the facts and issues discussed above." None of the earlier staff letters, including the Deputy Secretary's March 1970 letter, had such a disclaimer.
 
 
 [16]
 One analysis points out that psychological pressures on consumers make them reluctant to accept negative information about a decision they have already made and propel them toward completion of the final transaction if others have also taken affirmative steps toward that end, such as approving the consumers' credit. Landers & Rohner, A Functional Analysis to Truth in Lending, 26 U.C.L.A.L.Rev. 711, 715 & n.14, 716-17 & n.19 (1979). Potential fears of losing their deposit or a "stand-by" fee would presumably intensify those pressures
 
 
 [17]
 Pub.L. 93-495, § 409, 88 Stat. 1519 (1975) (repealed 1976)
 
 
 [18]
 Pub.L. 93-533, § 6(a), 88 Stat. 1726 (1974) (repealed 1976)
 
 
 [19]
 Pub.L. 94-205, §§ 5 & 11, 89 Stat. 1158 & 1159 (1976)
 
 
 [20]
 Cf. Farmers' & Mechanics' National Bank v. Dearing, 91 U.S. 29, 36, 23 L.Ed. 196 (1875), cited by Oriental, where the Court found subsequent legislation "show(ed) the spirit by which Congress was animated" in an earlier statute. A later act of Congress in that case, however, divided the statute into two sections, thereby making one reading of the earlier version impossible; the Court also noted that Congress passed a later unambiguous statute on the same subject. None of those things occurred here. Nothing in the 1974 legislation or the 1976 repeals affects the facts of this case or the lower court's application of the law to them
 
 
 [21]
 For a discussion of the congressional concerns over RESPA, see Stoppello, Federal Regulation of Home Mortgage Settlement Costs: RESPA and its Alternatives, 63 Minn.L.Rev. 367 (1979)
 
 
 [22]
 Wachtel v. West, 476 F.2d 1062 (6th Cir.), cert. denied, 414 U.S. 874, 94 S.Ct. 161, 38 L.Ed.2d 114 (1973), is cited by Oriental for rejection of a continuing violation theory in a Truth-in-Lending case. That case, however, presented an altogether different issue. There the required disclosures had never been made, and the court of appeals refused to find that the violation continued indefinitely after the transaction was consummated. There was no discussion of any time gap as here between nondisclosure and commitment and a later disclosure at settlement. Stevens v. Rock Springs Nat'l Bank, 497 F.2d 307 (10th Cir. 1974), and Harvey v. Housing Development Corp., 451 F.Supp. 1198 (W.D.Mo.1978), also involved no gap between the creation of a contractual relationship and final settlement of a loan
 
 
 [23]
 Oriental argues that the one-year time bar in § 130(e) should be interpreted more strictly than other statutes of limitations because § 130(e) is part of the same statute which authorizes the Postows' cause of action. It may be that a statutory time bar incorporated in legislation which creates a cause of action differs from a statute of limitations relating to a common law remedy in that the running of the former eliminates the cause of action and subject matter jurisdiction, while the running of the latter extinguishes the remedy of judicial review but not the underlying substantive right. See, e. g., Jamerson v. Miles, 421 F.Supp. 107, 110 (N.D.Tex.1976); Fenton v. Citizens Savings Ass'n, 400 F.Supp. 874, 879 (C.D.Mo.1975). That distinction, however, is irrelevant for our purposes
 
 
 [24]
 Rule 23(b)(3) states that a cause of action may be maintained as a class action if the district court finds that the common questions of law or fact "predominate" over those affecting the members of the class individually, and that a class action would be "superior" to other ways of resolving the controversy. Since the Postows contended below that Count I was the "gravamen" of their complaint, and since Oriental was granted summary judgment on Count I, Oriental argues that, without a hearing, the district court had no basis on which to conclude that the common issues in Count II predominated in the suit as a whole over those of the individual class members. Oriental also challenges the initial certification of Count II as a class action because of the district court's failure to explain why a class action was superior to other ways of proceeding, in the absence of actual damages. Neither argument need detain us long
 Whether the Postows were initially principally concerned with Count I rather than Count II is irrelevant to the determination of whether the common legal and factual issues in Count II predominated over the individual issues in that count. It would have been preferable if the district court had explained why it concluded that the common issues in Count II predominated over the individual Count II issues, rather than simply making that finding as it did here. But on the facts of this case we cannot conclude that was an abuse of discretion. Neither was it an abuse of discretion for the court not to explain why the absence of actual damages did not preclude a finding that proceeding as a class action on Count II was superior to other alternatives. As the Senate Committee on Banking, Housing and Urban Affairs stated in 1973, regarding the later amendments to § 130 specifically allowing class actions in Truth-in-Lending cases, "remedies (under the Act) should not be restricted to actual damages. As the Committee pointed out last year, 'most Truth-in-Lending violations do not involve actual damages . . . .' " S.Rep.No. 278, 93d Cong., 1st Sess. 15 (1973) (hereinafter 1973 Senate Report ).
 
 
 [25]
 Katz predates Eisen and concerns an express waiver by the defendant of the Rule 23(c) protections, but its rationale remains instructive. As the Third Circuit wrote in Katz :
 . . . If a class action defendant insists upon early class action determination and notice, he is, under the rule, entitled to it. But where he makes a nonfrivolous claim that his business will be harmed or disrupted by the notice, and is willing to run the risk that the determination of liability, if he loses, will be given effect in favor of the class, with notice in the event of such determination, the district court must seriously consider that alternative, and should, absent other compelling circumstances, pursue that course.
 496 F.2d at 762 (footnote omitted).
 Katz was followed by Haas, a post-Eisen decision which directly addressed the issue here and found Eisen not controlling:
 Summary judgment presents none of the difficulties which caused the Supreme Court to strike down the preliminary mini-hearing concept since, under the standard of Rule 56, it can constitute a final, appealable decision of the case. Because no court may resort to summary judgment determination until it has determined that no genuine issue of material fact remains in the case and only questions of law are left for resolution, the preliminary mini-hearing's spectre of placing the defendant in double peril is not presented. Moreover, Rule 56 and the case law interpreting it have clearly delineated the procedural protections entailed in handling a motion for summary judgment.
 
 
 [381]
 F.Supp. at 805
 
 
 [26]
 It is unclear from the Court's opinion whether McDonald involved Rule 23(b)(3), but the decision of the Seventh Circuit there under review concluded that all potential class members could participate in the suit even after the judgment on the merits "unless they choose to opt out under Rule 23(c)(2)." Romasanta v. United Airlines, Inc., 537 F.2d 915, 920 (7th Cir. 1976). Rule 23(c)(2) is applicable only to Rule 23(b)(3) class actions
 
 
 [27]
 See Livesay v. Punta Gorda Isles, Inc., 550 F.2d 1106, 1108 (8th Cir. 1977) (the decision of the Eighth Circuit under review in Coopers & Lybrand )
 
 
 [28]
 Mr. Justice Powell, dissenting, specifically raised the "one-way" intervention issue, 100 S.Ct. at 1182 & n.14 (Powell, J., dissenting), but there was no rejoinder in the majority opinion or in the three special concurring opinions
 
 
 [29]
 In a Rule 23(b)(1) class action, to which the individual notice requirements under Rule 23(c)(2) at issue in Eisen do not apply, this court in Larionoff v. United States, 533 F.2d 1167, 1182-83 (D.C. Cir. 1976), commented that post-judgment certification would be improper in a Rule 23(b)(3) case. The cases Larionoff cites for its observation regarding Rule 23(b)(3), 533 F.2d at 1183 n.39, however, did not present the equitable considerations of this case. In Roberts v. American Airlines, Inc., 526 F.2d 757 (7th Cir. 1975), for example, the defendant was granted summary judgment before any action was taken on class certification. To preclude the possibility that the class would be certified after remand, thereby expanding the defendant's stare decisis defense into one of res judicata, the court of appeals directed that the class not be certified on remand; it did not hold that post-judgment class certification is always improper. Id. at 762-63. In Peritz, it was the plaintiffs who pressed for a decision on the merits before certification. 523 F.2d at 354. Furthermore, McDonald and Roper had not been decided at the time of the Larionoff decision
 
 
 [30]
 The Postows filed their complaint as a Rule 23(b)(3) class action on November 6, 1973, and later that month filed interrogatories asking for specific information on prospective class members. Oriental moved to dismiss in December 1973; that motion was argued in June 1974. In the interim, Oriental moved to stay discovery only until a decision on its motion to dismiss, and the Postows agreed. Since Oriental appended materials outside the pleadings to its reply memorandum regarding its motion to dismiss, Oriental stated it was willing to have its motion to dismiss treated as one for summary judgment, and in fact Oriental formally moved for summary judgment on both counts in September 1974 before a decision was rendered on its motion to dismiss. The Postows opposed Oriental's summary judgment motion, in part asserting there were contested issues of fact both for them and for other members of the class
 The principal district court opinion under review was issued on March 14, 1975, granting Oriental's motion for summary judgment on Count I, denying Oriental summary judgment on Count II, and certifying Count II as a class action. On March 31, 1975, Oriental moved for reconsideration of the district court's class certification of Count II on the ground that, in the June 1974 hearing on Oriental's motion to dismiss, the district court foreclosed argument on certification. From the bench on the day Oriental's motion for reconsideration was argued, the district court granted an oral motion of the Postows' lawyer for summary judgment as to Count II; that was reaffirmed in a written order the next day. That written order also certified the court's summary judgment rulings on both counts for interlocutory appeal under 28 U.S.C. § 1292(b) and vacated that part of the March 17, 1975 opinion certifying Count II as a class action, pending the interlocutory appeal. The Postows then unsuccessfully moved for reconsideration, specifically bringing Eisen to the district court's attention and offering to withdraw their lawyer's oral motion for summary judgment pending a recertification of the class and notice to its members. This court later denied, as untimely filed, Oriental's petition for leave to file an interlocutory appeal and in December 1975 the district court recertified the class.
 At a status conference the district court held on the class notice issue in February 1976, Oriental argued that Eisen precluded class certification, and shortly thereafter Oriental moved to vacate the class action recertification. In March 1976 the district court denied Oriental's motion to vacate the class recertification, concluding that Eisen's comments about the perils of post-judgment certification "address quite different interests than are here at stake." Focusing on Oriental's first filing a motion to dismiss, then on its moving for a stay of discovery relating at least in part to identification of the class, and finally on its voluntarily moving for summary judgment before the court decided its pending motion to dismiss or reached a determination on the class certification issue, the district court concluded that Oriental's actions effectively constituted a waiver of the Rule 23(c) protections. Shortly thereafter, the court approved a notice to be sent to potential class members which did not state that the Postows had prevailed on Count II. The notice in fact recited that those electing to be excluded from the class would not be bound by a judgment "whether favorable or not," and there was a similar disclaimer that those who did not ask to be excluded would be bound "whether (the court's ruling was) favorable or not." J.A. 217. Potential class members were allowed to write the Postows' lawyer for further information, and he was directed to answer in writing only after obtaining court approval of the response, but there is no indication in the district court record that any potential class members wrote the Postows' lawyer or otherwise were informed of the court's ruling on the merits for the Postows before deciding whether to be excluded or to join the action.
 
 
 [31]
 Sixty-two members of the class initially chose to be excluded; the court's decision regarding attorneys' fees notes that two more members of the class later moved to be excluded and were given the court's permission to do so
 
 
 [32]
 The court arrived at the maximum statutory recovery by computing one percent of Oriental's reported net worth of $4,470,084, or $44,700.84. One-half of that amounts to $22,350.42
 
 
 [33]
 Relying on § 2106, federal appellate courts have modified damage awards where the district court had already failed to follow an earlier remand order, Petition of United States Steel Corp., 479 F.2d 489, 500-01 (6th Cir. 1973), or where the long-delayed final resolution of the controversy would only be further postponed by a remand and another appeal. Felder v. United States, 543 F.2d 657, 671 (9th Cir. 1976) (seven years' delay). Appellate courts have also amended damage awards without relying upon § 2106, because of delay, Georgia-Pacific Corp. v. U. S. Plywood-Champion Papers, Inc., 446 F.2d 295, 299 (2d Cir.), cert. denied, 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971) (16 years' delay), where the district court failed to consider the defendant's financial situation, Buckley v. Littell, 539 F.2d 882, 897 (2d Cir. 1976) (defendant "ha(d) been a man of the cloth and a professor of religion and hence subject to such a person's notoriously low salary"), or where the district court simply based its award on an erroneous assumption, Carroll v. United States, 133 F.2d 690, 694 (2d Cir. 1943) (L. Hand, J.) (the award "presupposed that the war bonus would continue for the whole period of the libellant's future working life clearly an unwarranted assumption")
 
 
 [34]
 Oriental also argues that because Count I was the major focus of concern throughout most of the litigation, this case does not qualify as a "successful action to enforce" the Truth-in-Lending Act, a predicate to recovery of attorneys' fees, and that thus the Postows are entitled to no fees at all. 15 U.S.C. § 1640(a)(3). This argument has no merit; so long as the plaintiffs prevail on the merits of some portion of their lawsuit, furthering the purposes of the Act, they are "successful" and entitled to the benefits of § 1640(a) (3). This does not, of course, answer the further question of whether they are entitled to attorneys' fees for those portions of their claim as to which they do not prevail, a question we deal with infra
 
 
 [35]
 Oriental relies upon Gulf, C. & S. F. Ry. v. Ellis, 165 U.S. 150, 17 S.Ct. 255, 41 L.Ed. 666 (1897), in support of its claim that the attorneys' fee provision in § 130 is invalid on its face, and cites Chicago & N. W. Ry. v. Nye Schneider Fowler Co., 260 U.S. 35, 43 S.Ct. 55, 67 L.Ed. 115 (1922), for the argument that § 130 as applied here is unconstitutional. Ellis invalidated, on due process and equal protection grounds, a Texas attorneys' fees statute granting such fees only to successful plaintiffs. But that holding turned on the fact that the statute applied only to defendants which were railroads and not to other defendants which might also have been found liable for the prohibited actions. The statute was not invalidated because it did not provide for parties qua defendants to receive attorneys' fees if successful
 In Nye, the Court refused to uphold a statute which "work(s) an arbitrary, unequal and oppressive result . . . which shocks the sense of fairness the Fourteenth Amendment was intended to satisfy . . . ." 260 U.S. at 44-45, 43 S.Ct. at 59. The statute invalidated in Nye required a successful defendant on appeal to pay his adversary's appellate attorneys' fees if the plaintiff's ultimate recovery exceeded what the defendant initially tendered as payment before the litigation began. As the Nye Court remarked: "(W)hat we have here is a requirement that the carrier shall pay the attorneys of the claimant full compensation for their labors in resisting its successful effort on appeal to reduce an unjust and excessive claim against it. This we do not think is fair play." Id. at 47, 43 S.Ct. at 60. That result bears no analogy to this case.
 
 
 [36]
 The Postows principally asserted two theories to support their argument, both of which we have rejected. See note 2, supra
 
 
 [37]
 See text preceding note, 5, supra
 
 
 [38]
 We also affirm the district court's rejection of the Postows' claim for their expenses in hiring an expert witness to establish Oriental's net worth; one percent of that figure was the maximum possible class recovery. The court concluded there were less expensive alternatives, such as the filing of requests for admissions of fact or interrogatories, which the Postows could have utilized to present evidence on Oriental's net worth. We find no abuse of discretion in that decision. Finally, the district court initially rejected the Postows' claim for reimbursement of deposition fees of $180.66, without prejudice to resubmission, because the Postows had not established whether those depositions were among those introduced into evidence or were simply used in preparation of the case. Pursuant to the district court's invitation, the Postows later established that the Tascher deposition, which they took, was among those introduced into evidence, but since it was unclear whether the $180.66 they sought for the Tascher deposition also included expenses for copies of depositions taken by Oriental and for which Oriental bore the principal cost, the court denied the Postows' renewed request for reimbursement of the whole $180.66. We find that to be an abuse of discretion and remand for the purpose of giving the Postows an opportunity to submit evidence on whether the $180.66 at issue related solely to the Tascher deposition or whether it included expenses for copies of other depositions as well, and for the entry of an appropriate order on this issue