**CONSUMERS UNION OF U.S., INC., Plaintiff,**

v.

**FEDERAL RESERVE BOARD, Defendant.**

**Civ. A. No. 89–3008–GHR.**

United States District Court, District of Columbia.

May 2, 1990.

Michelle Meier and Linda Lipsen, Consumers Union, Washington, D.C., for plaintiff.

Steve Frank and Theodore C. Hirt, Attys., Dept. of Justice, Civ. Div., and Richard Ashton and Katherine Wheatley, Bd. of Governors of the Federal Reserve System, Washington, D.C., for defendant.

## MEMORANDUM DECISION AND ORDER

REVERCOMB, District Judge.

Plaintiff seeks judicial review pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, of regulations promulgated by the Federal Reserve Board pursuant to the Home Equity Loan Consumer Protection Act of 1988 ("HEL Act"), Pub.L. No. 100–709, 102 Stat. 4725. The HEL Act amended the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, to provide disclosures and substantive limitations with respect to open-end lines of credit secured by consumers' residences. Section 7(a) of the HEL Act instructed the Board to promulgate regulations to carry out the purposes of the amending legislation. On January 23, 1989, the Board published a proposed rule to amend Regulation Z to implement the HEL Act. 54 Fed.Reg. 3063. The Board received approximately 150 comments on the proposal. On June 9, 1989, after a review of the comments and further analysis, the Board adopted a final rule implementing the HEL Act. 54 Fed. Reg. 24670. This matter is before the Court pursuant to defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, and the plaintiff's Motion for Summary Judgment.

### A. *Standard of Review*

The APA provides that agency action [1] may be set aside only if arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or if the action failed to meet statutory, procedural, or constitutional requirements. 5 U.S.C. § 706(2). The agency's decision is entitled to a presumption of regularity, *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), and "[t]he burden of overcoming the presumption of validity is on the party seeking review." *Sierra Pac. Indus. v. Block*, 643 F.Supp. 1256, 1266 (N.D.Cal. 1986); *see also Short Haul Survival Comm. v. United States*, 572 F.2d 240, 244 (9th Cir.1978) (party challenging the agen-

1. The APA provides that in reviewing the validity of agency action, "the court shall review the whole record or those parts of it cited by a party." 5 U.S.C. § 706(2). Such review is generally limited to the administrative record presented by the agency to the reviewing court. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 1606–07, 84 L.Ed.2d 643 (1985); *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *Citizens to Preserve Overton Park*, 401 U.S. at 420, 91 S.Ct. at 825. That record consists of the materials and files that were before the agency at the time the rule was promulgated or a decision was made, not materials adduced through *de novo* proceedings in court. *See FPC v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 331, 96 S.Ct. 579, 582, 46 L.Ed.2d 533 (1976).

In an informal rulemaking proceeding the record may include comments received in response to the notice of proposed rulemaking, *Sima Products Corp. v. McLucas*, 612 F.2d 309, 314 (7th Cir.), *cert. denied*, 446 U.S. 908, 100 S.Ct. 1834, 64 L.Ed.2d 260 (1980); any information gathered or put forth by the agency in the course of the rulemaking proceeding, *Action for Children's Television v. FCC*, 564 F.2d 458, 471 (D.C.Cir.1977); information that the agency directly or indirectly considered in rendering its decision, *MGPC, Inc. v. Duncan*, 581 F.Supp. 1047, 1058 (D.Wyo.1984), *rev'd on other grounds, MGPC, Inc. v. Department of Energy*, 763 F.2d 422 (Temp.Emer.Ct.App.), *cert. denied*, 474 U.S. 823, 106 S.Ct. 76, 88 L.Ed.2d 62 (1985); and the promulgated rule and the agency's explanation of its action as set forth in the notice of proposed rulemaking and final rule notice, *Sima Products Corp. v. McLucas*, 612 F.2d at 314. *See* 5B Mezines, J. Stein & J. Gruff, *Administrative Law* § 52.02 (1987). Moreover, an agency "may act not only on the basis of the comments received in response to its notice of rulemaking, but also upon the basis of information available in its own files, and upon the knowledge and expertise of the agency." *California Citizens Band Ass'n v. United States*, 375 F.2d 43, 54 (9th Cir.), *cert. denied*, 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967); *see also Action for Children's Television*, 564 F.2d at 471.

cy action has a "heavy burden" of showing that the agency acted unreasonably).

■ The need for deference is all the more compelling where the Board is not only charged with administering the statute, *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), but where Congress has specifically delegated authority to the Board to elucidate a specific provision of the statute by regulation. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

Under this highly deferential standard this Court cannot substitute its own judgment for that of the Board's provided that its decision is "rational and reflect[s] a full consideration of relevant factors." *National Indus. Sand Ass'n v. Marshall*, 601 F.2d 689, 699 (3d Cir.1979). Congress has relied on the discretion of the Board to administer the HEL Act based on its expertise in the area and this Court should accordingly defer where appropriate. As the Supreme Court has held:

> That some other remedial provision might be preferable is irrelevant. We have consistently held that where reasonable minds may differ as to which of several remedial measures should be chosen, courts should defer to informed experience and judgment of the agency to whom Congress delegated appropriate authority.

*Mourning v. Family Publications Serv., Inc.*, 411 U.S. 356, 371–72, 93 S.Ct. 1652, 1662, 36 L.Ed.2d 318 (1973).

Moreover, Congress has granted broad authority to the defendant under the TILA. Section 105 of the TILA authorizes the Board to:

> prescribe regulations to carry out the purposes of this subchapter. These regulations may contain such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of transactions,

as in the judgment of the Board are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate compliance therewith.

15 U.S.C. § 1604. The Supreme Court has recognized the complexity of the subject matter of credit transactions and specifically discussed the practical necessity for judicial deference to the Board pursuant to its authority in section 1604:

> [W]holly apart from jurisprudential considerations or congressional intent, deference to the Federal Reserve is compelled by necessity; a court that tries to chart a true course to the Act's purpose embarks upon a voyage without a compass when it disregards the agency's views. The concept of "meaningful disclosure" that animates TILA ... cannot be applied in the abstract. *Meaningful* disclosure does not mean *more* disclosure. Rather, it describes a balance between "competing considerations of complete disclosure ... and the need to avoid ... [information overload]." And striking the appropriate balance is an empirical process that entails investigation into consumer psychology and that presupposes broad experience with credit practices. Administrative agencies are simply better suited than courts to engage in such a process.

*Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 568–69, 100 S.Ct. 790, 798, 63 L.Ed.2d 22 (1980); *see also Postow v. OBA Federal S & L Ass'n*, 627 F.2d 1370, 1377 (D.C.Cir.1980).

■ The plaintiff contends that the "exception authority" of section 105 of the TILA does not apply to the HEL Act, which amended the TILA, because the sole rulemaking authority for the HEL Act is 15 U.S.C. § 1637a note.[2] There is simply no basis for plaintiff to argue that Congress intended to prohibit the Board from invoking the broad discretionary authority of section 1604 in promulgating regulations

---

**2.** Section 7(a) provides:

(a) **Regulations.**—Before the end of the 60-day period beginning on the date of the enactment of this Act [Nov. 23, 1988], the Board of Governors of the Federal Reserve System shall prescribe such regulations as may be necessary to carry out the proposes [sic] of the amendments made by this Act.

pursuant to the HEL Act. Plaintiff's argument that Congress was unaware of section 1604, part of the very statutory scheme that Congress was amending, is unsupported by the record and is speculative at best. Indeed, on the contrary, it is always appropriate to assume that Congress knows what the existing law—whether statutory or judicial precedent—is. *See generally Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); *In re A.B.,* 556 A.2d 645, 648 n. 5 (D.C.1989).

The plaintiff further argues that because the HEL Act, unlike the TILA, is drafted with such specificity that Congress intended to leave very little implementing discretion to the Board and that accordingly the expansive authority of section 1604 does not apply. The short answer to this argument, of course, is that if the legislation were so comprehensive and the need for agency expertise and discretion so limited, then why did Congress specifically require the Board to promulgate regulations under the legislation. Moreover, the TILA similarly contains sections of detailed legislation and yet section 1604 has applied across the board. Accordingly, this Court rules that the "exception authority" of section 1604 applies to the Board in promulgating regulations pursuant to the HEL Act and that those regulations, involving complex credit transaction issues, are entitled to the judicial deference that the Supreme Court established in *Ford Motor.*

### B. *Disclosure of the Margin*

■ The plaintiff contends that the HEL Act requires lenders offering variable rate HELs to disclose the complete formula under which the interest rate will be determined, including the margin value, in the

preapplication stage.[3] The Board's regulations do not require preapplication disclosure of the margin but do require lenders to advise consumers in the early disclosure period to "ask about" the current margin.[4] 12 C.F.R. § 226.5b(d)(12)(v).

The HEL Act provides that lenders must disclose:

(A) a description of the manner in which such rate will be computed and a statement that such rate does not include costs other than interest;

(B) a description of the manner in which any changes in the annual percentage rate (APR) will be made, including—(iii) any index or margin to which such changes in the rate are related.

15 U.S.C. § 1637a(a)(2)(A), (B)(iii). The plaintiff reads the plain language of this section to require that lenders disclose the margin to consumers. However, a literal reading of the statute does not support the plaintiff's position; the literal language of the statute provides that lenders must disclose "a description of the manner in which *changes* " in the interest rate will be made, including "any index or margin to which such *changes* in the rate are related." *Id.* (emphasis added). In the normal case, the change in the interest rate of a variable HEL is not related to the margin but to the index; the margin is generally a fixed figure which will not be responsible for a change in the interest rate. Accordingly, the lenders would only be required to describe how the interest rate would change over time due to the index. Under some plans, the margin may change upon the occurrence of specified events, such as a change in the consumer's employment or deposit relationship with the lender. In such instances, consistent with the plain language of the statute, the lender would

3. Interest rates on variable rate loans are typically composed of two parts: an index rate that varies over time (for example, the prime rate published in the *Wall Street Journal* ) and a margin, a fixed percentage rate that is added to the index rate.

4. The plaintiff contends that the "ask about" provisions are meaningless because consumers are always entitled to ask the lenders anything about the HEL plans and do not need regulatory

authority to do so. Plaintiff does not understand the purpose of "ask about" regulations. Simply because consumers have the right to ask about anything does not necessarily mean that they know precisely what they should ask about in order to become informed. By requiring the lenders to advise the consumers to inquire for specific information the regulations ensure that the consumers have some guidance in learning about the HEL plans.

then be required to describe how the margin will relate to a change in the interest rate. 12 C.F.R. § 226.5b(d)(12)(viii).

### C. *Disclosure of the Initial Discount Rate*

■ The plaintiff further challenges the Board's regulations because they do not require the disclosure of a specific discounted initial rate. The HEL Act requires the following disclosure:

If an initial annual percentage rate is offered which is not based on an index—
(i) a statement of such rate and the period of time such initial rate will be in effect; and
(ii) a statement that such rate does not include costs other than interest.

15 U.S.C. § 1637a(a)(2)(C).

Although the defendant concedes that the plain language of the statute suggests the disclosure of a discounted initial rate, the Board does not require its disclosure because it would be virtually impossible for lenders to disclose a specific initial discount on a preprinted early disclosure form where the initial discount is highly variable, is affected by competitive considerations, and may be the subject of negotiations between the parties. Accordingly, the regulations require lenders to advise consumers to "ask about the current . . . discount or premium." 12 C.F.R. § 226.5b(d)(12)(v). This Court recognizes that the plain language of the statute certainly supports an argument for disclosure of a discounted initial rate but, in light of the Board's explanation for the regulations, this is such an issue on which the Court finds it appropriate to defer to the Board under its "exception authority."

This deference is all the more appropriate in light of the fact that the specific discounted initial rate is not something that lenders would be inclined to hide but, on the contrary, is likely to be prominently displayed in any advertising for the home equity line as one of the lender's competitive incentives. According to the Board, the real consumer interest to be protected by section 1637a(a)(2)(C) is apprising the consumer that the initial discounted rate is temporary and that the rate will go up after a relatively short period of time. Accordingly, consistent with the statute, the regulation does require disclosure of the critical information that the initial discounted rate "is not based on the index and margin used to make later adjustments, and the period of time such initial rate will be in effect." 12 C.F.R. § 226.5b(d)(12)(vi).

### D. *Disclosure of Margin and Discount in Historical Table*

■ The HEL Act requires variable rate lenders to include in the preapplication disclosure a "historical table":

based on a $10,000 extension of credit, showing how the annual percentage rate and the minimum periodic payment amount under each repayment option of the plan would have been affected during the preceding 15–year period by changes in any index used to compute such rate.

15 U.S.C. § 1637a(a)(2)(G). Under the Board's regulations, lenders are permitted in preparing the historical table to use any margin and any discounted initial rate, if the plan has one, that they have used within the six months preceding preparation of the disclosures. 12 C.F.R. § 226.5b(d)(12)(xi). In addition, the lenders must disclose to the consumer that the margin or premium is "one that the creditor has used recently." 54 Fed.Reg. 24678 (June 9, 1989). The plaintiff objects to the regulations on the ground that if the historical table does not use the current margin and discount in calculating the APR and minimum payment, then consumers are not informed how the historical index values would have affected the terms of the plan being offered.

The plain language of the statute does not expressly state whether lenders must base the historical table on the terms of the plan being offered or whether the lenders can rely upon the terms of a plan that it has offered in the past which the defendant has limited to a six-month period. Indeed, the statute does not even refer to the margin or the discount but simply refers to the historical index. The plaintiff argues, however, that as a practical matter the statute

must necessarily contemplate the current margin and discount because the lenders are required to illustrate how changes in the index would have effected a consumer's annual percentage rate and minimum payments under the plan. Since the margin and discount are integral to a determination of the amount of a consumer's APR and minimum payment, the plaintiff argues that the only way to accurately reflect these calculations is by the use of current figures.

The defendant, however, contends that the purpose of the historical table is to demonstrate to consumers that minimum payments and APRs under HEL plans can fluctuate. Accordingly, whether a current or recent margin and discount is used is largely not relevant. The plaintiff's argument that the current margin and discount must be used in order to accurately reflect the consumer's minimum payments and APRs is of minor import where the table cannot be used as a means by which to extrapolate a consumer's minimum payments or APR into the future because there is little likelihood that the future index will mirror the historical index. Moreover, the historical table takes into account the amortization of principal over the life of the loan. Accordingly, the historical table is not intended to provide consumers with a guide to what their payments would be at any given index rate and any attempt to use it in that manner would necessarily be misleading, regardless of what margin and discount figures are used.[5]

E. *Disclosure of Maximum Interest Rate*

■ Plaintiff also challenges the provision of the regulations relating to the annual and lifetime rate caps imposed under home equity plans. These caps protect consumers from the effects of extreme fluctuations in the index value. Lenders offering variable interest rates must disclose:

(E) a statement of the maximum amount by which the annual percentage rate may change in any 1–year period or a statement that no such limit exists;

(F) a statement of the maximum annual percentage rate that may be imposed at any time under the plan.

15 U.S.C. § 1637a(a)(2)(E), (F). The regulations, rather than requiring the specific maximum cap, permit lenders to disclose "the range of the lowest and highest rate limitations that may be applicable." 54 Fed.Reg. 24677 (June 9, 1989). Additionally, the lenders may disclose the lifetime cap as a stated amount above the initial rate. *Id.* For example, the lender could simply state that the rate will never increase higher than 5 points above the initial interest rate. *Id.*

Contrary to the position of the plaintiff, the plain language of the statute does not require that the lenders disclose the specific maximum cap. Indeed, § 1637a(a)(2)(E) expressly contemplates the type of disclosure that the regulations permit by providing that the lenders put the consumers on notice of "the maximum *amount* by which the annual percentage rate *may change.*" Moreover, although § 1637a(a)(2)(F) does not similarly expressly authorize a range, that section certainly does not prohibit it. Where a consumer is on notice that the annual percentage rate will not rise above, for example, five points of the initial rate, it is impossible to comprehend how the consumer would not be on notice of the maximum annual percentage rate that may be imposed at any time under the plan.

The use of a range is all the more reasonable under the statutory scheme in light of the fact that for many lenders it simply is not practically possible to disclose the initial discounted rate or current rate on a preprinted form. Indeed, Congress required in the HEL Act simply that the

---

5. Consumers are given some information about the typical payments they may face. Both the HEL Act and the regulations require the disclosure of the minimum periodic payment for a $10,000 single advance and the time period it would take to pay off such an advance if only the minimum payments are made. 15 U.S.C. § 1637a(a)(9); 12 C.F.R. § 226.5b(d)(5)(iii). Notably, the statute there specifically permits the use of an annual percentage rate that was used "recently."

disclosures in the preapplication process must include "a statement that the consumer should ask about the current index value and interest rate." 15 U.S.C. § 1637a(a)(2)(D). Similarly, although lenders are permitted to disclose only a range figure in the preapplication process, when they do so they must also advise the consumer to "ask about" the current specific maximum rates under the plan. 54 Fed. Reg. 24677 (June 9, 1989).

### F. *Disclosure of Payment Options*

■ The plaintiff further argues that the regulations improperly permit the use of representative payment options in connection with minimum periodic payment for an assumed $10,000 advance required by section 1637a(a)(9), the historical table required by section 1637a(a)(2)(G), and the disclosure of the minimum payment that would be in effect if the APR were at the lifetime cap (the "maximum payment") required by section 1637a(a)(2)(H).

> Section 1637a(a)(9) requires disclosure of An example, based on a $10,000 outstanding balance and the interest rate ... which is, or was recently, in effect under such plan, showing the minimum monthly or periodic payment, and the time it would take to repay the entire $10,000 if the consumer paid only the minimum periodic payments and obtained no additional extensions of credit.

The HEL Act further requires the lenders to include the following information in the preapplication disclosure:

> (G) subject to subsection (b)(3) of this section, a table, based on a $10,000 extension of credit, showing how the ... minimum periodic payment amount under each repayment option of the plan would

have been affected during the preceding 15–year period by changes in any index used to compute such rate;

> (H) a statement of—
>
> (i) the maximum annual percentage which may be imposed under each repayment option of the plan;
>
> (ii) the minimum amount of any periodic payment which may be required, based on a $10,000 outstanding balance, under each such option when such maximum annual percentage rate is in effect;

15 U.S.C. § 1637a(a)(2)(G), (H).

Even assuming that the plain language of the statute could support the requirement that lenders provide a separate disclosure for each payment option under the three sections above,[6] the defendant contends that in order to comply with such disclosure lenders in some cases would have to provide hundreds of separate tables and statements which would constitute, in the Board's view, "informational overload" that would frustrate the purpose of the statute to provide meaningful disclosure to the consumers.[7] Accordingly, the Board contends that in such a circumstance its discretion to invoke the "exception authority" of sanction 1604 is implicated and that this Court should defer unless the exercise of that authority is demonstrably irrational or obviously repugnant to the statutory scheme.

Accordingly, instead of requiring that lenders provide disclosure for each payment option available, to avoid informational overload the Board's regulations require lenders to provide representative examples of each of the general categories of payment options that the lender offers to the consumer.[8] 54 Fed.Reg. 24676 (June 9,

---

**6.** This Court agrees with the plaintiff that the literal language of sections 1637a(a)(2)(G) and (H) suggests that lenders provide disclosure for each and every option. However, the literal language of section 1637a(a)(9), which calls only for *"an example,* based on ... the interest rate [other than a discounted rate] which is, or was recently, in effect *under such plan"* (emphasis added), does not support the plaintiff's *position.*

**7.** Indeed, according to the defendant, it would be literally impossible for some lenders to provide a separate historical table and maximum payment figure for each payment option because under some options the consumer has complete discretion in the amount he will pay and considerable discretion in the timing of payments.

**8.** The Board has determined that three general categories of payment options exist in the world of home equity loans: (1) plans that permit

1989). For example, rather than requiring the lender to disclose a separate disclosure for *each* fixed percentage payment option that is available to the consumer (*i.e.*, one percent of the balance, two percent of the balance, three percent of the balance), the regulations simply require that the lender disclose a representative example (*i.e.*, two percent of the balance) to demonstrate the way in which fixed percentage payment options operate.

Furthermore, the regulations do require a narrative description of each repayment option, including the length of the draw and repayment periods, how the minimum periodic payment is calculated, the timing of payments, and whether paying the minimum payment may result in a balloon payment at the end of the period. If different payment terms apply to the draw and repayment periods, this too must be disclosed. *See* 12 C.F.R. § 226.5b(d)(5). Accordingly, plaintiff's contention that the lenders must disclose a repayment example for each option in order to inform consumers of all of their repayment options is simply wrong.

### G. *Unilateral Contract Changes*

The plaintiff contends that the Board's regulations permit lenders to make unilateral changes in the terms of the contract which are expressly prohibited by the HEL Act. The HEL Act prohibits unilateral contract changes:

> No open end consumer credit plan under which extensions of credit are secured by a consumer's principal dwelling may contain a provision which permits a creditor to change unilaterally any term required to be disclosed under section 1637a(a) or any other term, except a change in insignificant terms such as the address of the creditor for billing purposes.

15 U.S.C. § 1647(c)(1). The plaintiff specifically contends that the defendant's regulation violates this statutory prohibition where it permits lenders to "[p]rovide in the initial agreement that specified changes will occur if a specific event takes place (for example, that the annual percentage rate will increase a specified amount if the consumer leaves the lenders's employment)." 12 C.F.R. § 226.5b(f)(3)(i). The Supplementary Information explains that "[t]his provision permits a creditor to implement specific changes set forth in the contract that are contemplated on the occurrence of a specific event. Both the triggering event and the resulting modification must be stated with specificity." 54 Fed. Reg. 24680. Examples given in the Supplementary Information include employee loan programs in which the margin or rate will increase upon the employee's termination and step rate or step fee schedules calling for specified changes at certain dates. *Id.*

The plaintiff contends that the only unilateral changes which lenders may make are those seven exceptions which Congress specifically set forth in section 1647(c)(2). As the plaintiff provides: "Congress would not have gone to the trouble of enumerating limited exceptions to the statutory prohibition if lenders could simply include an unlimited number of changes, in addition to the one identified in the statute, in the HEL contract." However, the plaintiff has mischaracterized the regulations as providing for unilateral changes. In fact, the regulations contemplate changes which the lenders can make only upon specified events which are *bilaterally* agreed to by the parties and accordingly the regulations do not go beyond the statutorily enumerated exceptions to the general prohibition against unilateral changes.

 As the legislative history to the HEL Act illustrates, section 1647(c)(1) was enacted to prohibit lenders from asserting

---

minimum payment of only accrued finance charges ("interest only" plans); (2) plans in which a "fixed percentage" is used to determine the minimum payment; and (3) all other types of minimum payment options. 54 Fed.Reg. 24676 (June 9, 1989). The Supplementary Information then provides that "[t]he creditor may use a single example within each category

to represent the payment options in that category." *Id.* As an example, the Supplementary Information states that if a lender permits minimum payments of 1%, 2%, 3% or 4% of the outstanding balance, the lender may pick one of these four options and allow it to represent the "fixed percentage" plans described in category two above.

a general reservation of rights in the contract which would permit them unilaterally to change any contractual term at will. As Senator Dodd, who sponsored the bill in the Senate, explained:

> [T]he bill establishes the general rule that the lender may not reserve the right to change unilaterally the terms of the contract after the agreement has been signed by both parties. When the agreement is signed, both the borrower and the lender should know the terms that will govern the loan.

134 *Cong.Rec.* S17222 (daily ed. Oct. 21, 1988). Accordingly, the regulation in fact prohibits such "boilerplate" reservation of rights clauses in home equity loan contracts. 54 Fed.Reg. 24680 (June 9, 1989). However, if a contract between the parties expressly provides for specific events which will trigger changes in the contract, then the lender is not acting unilaterally or at will to change a term; indeed, such a provision is itself a term which is bilaterally agreed to by the parties. In other words, the borrower and the lender in fact "know the terms that will govern the loan." [9]

The legislative history expressly provides that such changes do not constitute unilateral conduct which is prohibited. In a "Section-by-Section Clarification" inserted in the Congressional Record, the author of H.R. 3011 explained the prohibition of unilateral changes as follows:

> This section restricts unilateral change [sic] in terms *but does not preclude specific changes that are contemplated on the occurrence of a specified event.* For example, the agreement can provide for a change of index or margin in an em-

ployee loan program if the borrower's employment terminates.

134 *Cong.Rec.* H4474 (daily ed. June 20, 1988) (statement of Rep. Price). Similarly, Senator Dodd explained the "general rule that the lender may not reserve the right to change unilaterally the terms of the contract" by noting that

> [o]f course, lenders may include contingencies in their agreements that allow them to change the initial terms if the contingency is triggered. To keep within the purposes of the general rule, however, the event that could trigger the change, and the new term that would apply after the change is triggered, must be identified in the agreement.

134 *Cong.Rec.* S17222 (daily ed. Oct. 21, 1988).

### H. *Exceptions to Unilateral Contract Changes*

■■■ Congress has specifically enumerated in section 1647(c)(2) seven exceptions to the general prohibition against unilateral contract changes. Five of these statutorily prescribed exceptions allow the lender to prohibit additional extensions of credit or reduce the credit limit in narrowly drawn circumstances. For example, the lender may take this action if it "has reason to believe that the consumer will be unable to comply with the repayment requirements of the account due to a material change in the consumer's financial circumstances." 15 U.S.C. § 1647(c)(2)(C). The regulations fully recognize that lenders are prohibited from taking this action except in these five circumstances:

> The regulation also does not permit a creditor to include in the initial agreement any "triggering events" or permissible response that the regulation ex-

---

**9.** Ironically, although the plaintiff is challenging the regulation as authorizing unilateral changes which are impermissible under the statute, in its comments on the Board's proposed regulations, the plaintiff *agreed* that home equity contracts could provide for changes predicated on certain events. The plaintiff wrote:

> [T]he types of changes that the Act allows, and their triggering events, must be specifically identified in the [home equity loan] contract.... They may include, for example, interest rate increases that would accompany a

borrower's termination of employment with a particular employer. Alternatively, some lenders offer preferred rate terms to consumers that have CD's or other accounts at their institution. A legitimate change could include an increased interest rate that would accompany the borrower's termination of the account.

The examples offered by plaintiff in its comments as appropriate changes in terms are exactly what the Board has authorized.

pressly addresses ... For example, an agreement may not provide that the margin in a variable-rate plan will increase if there is a material change in the consumer's financial circumstances, since the triggering event (a material change in the consumer's financial circumstances) is set forth in the regulation and the permissible response (freezing the line or lowering the credit limit) is spelled out. Fed.Reg. 24680 (June 9, 1989). However, the plaintiff contends that the defendant's regulations nonetheless go beyond these five exceptions and allow lenders to freeze or reduce the consumer's credit line in two circumstances that are not expressly permitted by the statute.

First, the lender may take this action when "the maximum annual percentage rate is reached." 12 C.F.R. § 226.5b(f)(3)(vi)(G). This regulation is currently pending further consideration by the Board and this Court accordingly declines to address the issue. Second, a lender may freeze or reduce a consumer's credit line when "the creditor is notified by its regulatory agency that continued advances constitute an unsafe and unsound practice." 12 C.F.R. § 226.5b(f)(3)(vi)(F). A bank whose examination reports an unsafe or unsound practice is under an obligation to conform its activities to resolve the problem. The regulation simply recognizes this principle and accommodates the HEL Act to existing regulatory authority. There is nothing in the HEL Act or its legislative history that indicate an intent to override the traditional authority of bank supervisory agencies.[10] *See Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 468, 102 S.Ct. 1883, 1890, 72

L.Ed.2d 262 (1982) (it is a " 'cardinal principle of statutory construction that repeals by implication are not favored' ") (quoting *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 154, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540 (1976)); *see also Devine v. White,* 697 F.2d 421, 431 n. 42 (D.C.Cir. 1983) (legislation is not intended to alter the status quo or common law absent clear congressional intent to the contrary).

### I. *Disclosure of Terms Applicable to Repayment Phase*

The plaintiff contends that the Board's regulations impermissibly allow lenders to omit disclosure of repayment phase terms from the preapplication materials when the HEL plan contains both a draw phase and a repayment phase.[11] The plaintiff argues that Congress intended the preapplication disclosure to include key information about both phases. The HEL Act requires lenders to disclose:

> The repayment options under the plan, including, if applicable, any differences in repayment options with regard to any period during which additional extensions of credit may be obtained; and any period during which repayment is required to be made and no additional extensions of credit may be obtained.

15 U.S.C. § 1637a(a)(8)(A)(i), (ii).

The Board requests this Court to defer ruling on this challenge because the Board has recently published a notice in the Federal Register seeking comment on preapplication disclosure of the draw and repayment phases. 55 Fed.Reg. 10465 (March 21, 1990). Indeed, in the Board's final

---

**10.** Congress has enacted a comprehensive statutory framework for assuring the safety and soundness of banking institutions whose deposits are insured by the federal government. Federal bank regulators have the power to make periodic examinations of the banks under their jurisdiction. *See, e.g.,* 12 U.S.C. § 1820(b) (FDIC examination of insured state-chartered nonmember banks); 12 U.S.C. § 481 (Office of the Comptroller of the Currency examination of national banks); 12 U.S.C. § 483 (Federal Reserve Board examination of member banks). Such examinations routinely note matters that the examiners feel constitute unsafe or unsound banking practices. In addition, such practices form the basis for regulatory proceedings under

12 U.S.C. § 1818 and can lead to termination of deposit insurance, cease-and-desist orders against banks, and removal and prohibition orders against bank officers and directors.

**11.** Some HEL lenders divide their HEL plan into two phases—a "draw" phase and a "repayment" phase. During the draw phase, the borrower can continue to draw against the line of credit while making minimum periodic payments. During the repayment phase, the borrower can no longer draw against the account but simply repays on the amounts previously borrowed.

Commentary, which has just been released, the Board has in fact deleted the material about which the plaintiff complains.[12] Accordingly, this Court finds that deferral is appropriate on this issue where the Board is still soliciting comments on an issue for which its ultimate decision, based on its discretion and expertise, is a necessary component of any meaningful judicial review.

### J. Conclusion

This Court must defer to the defendant's regulations. Plaintiff does not challenge the reasonableness of the regulations from a practical perspective but simply argues that the defendant has violated the specifics of the HEL Act on sections for which there was no room for Board discretion. However, as discussed above, the defendant's regulations are generally consistent with the plain language and meaning of the statute. In those few cases where it is arguable whether the regulations follow the literal language of the statute, the defendant has invoked its "exception authority" in section 1604 and promulgated regulations which this Court finds to further the purposes of the HEL Act.

Accordingly, it hereby is

ORDERED that defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment be, and the same hereby is, GRANTED; and it is further

ORDERED that plaintiff's Motion for Summary Judgment be, and the same hereby is, DENIED.

12. The challenged material which has since been deleted provides:

A number of commenters requested guidance on what disclosures are required if the initial agreement calls for the draw phase of a plan to "convert" to a repayment phase, which has many aspects of closed-end credit. Some home equity plans provide in the initial agreement for a period during which repayment of the amount borrowed is made, but no further draws may be taken. In such cases, the disclosures must include information about both phases of the plan....

Although full disclosure of the terms about the repayment phase is required, creditors have a choice with regard to when it must be given. Creditors may provide all of this information at the time the early disclosures are given to the consumer. As an alternative, creditors need disclose only the basic payment terms information under section 226.-5b(d)(5)(i) and (ii) with the early disclosures, and defer all the other required disclosures about the repayment phase until conversion. 54 Fed.Reg. 24672 (June 9, 1989).