CONSUMERS UNION OF THE U.S., INC., Appellant,

v.

FEDERAL RESERVE BOARD.

No. 90–5186.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 20, 1991.

Decided July 12, 1991.

Michelle Meier, of the Bar of the U.S. Dist. Court, Covington, Ky., for D. of Columbia, pro hac vice, by special leave of the court, with whom Barry J. Reingold, Karl L. Kellar, and Michael L. Goo were on the brief, Washington, D.C., for appellant.

Steve Frank, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and Anthony J. Steinmeyer, Atty., Dept. of Justice, Richard Ashton and Katherine Wheatley, Attys., Bd. of Governors of the Federal Reserve System, were on the brief, Washington, D.C., for appellee.

Before SILBERMAN, WILLIAMS and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

This appeal from the district court challenges regulations issued by the Board of Governors of the Federal Reserve System implementing the amendments to the Truth in Lending Act ("TILA") concerning open-end home equity loans. Appellant asserts that the regulations are inconsistent with the statute. We reject the majority of appellant's contentions but remand to the Board on two issues.

I.

Open-end home equity loans ("HELs") are financial instruments whose popularity among ordinary consumers skyrocketed in the last few years, in large part because of the Tax Reform Act of 1986. That legislation made interest deductions on personal loans generally unavailable except with respect to residential housing indebtedness. Consequently, many consumers discovered tax advantages in converting an unsecured line of credit with their bank into a line of credit secured by the residence. The vast majority of these loans are not taken out to secure the actual purchase of the home, and therefore many of the borrowers do not need the principal of the loan distributed to them at once. They often prefer to have the ability to draw on their line of credit as needed; these loans are described as open-ended. The HEL differs from the traditional mortgage loan—also known as a closed-end loan—in which the borrower takes out the entire sum at the outset and then makes interest and principal payments on that fixed amount over the life of the loan.

The interest on the amounts advanced under an HEL is known as the annual percentage rate ("APR") and is the sum of two elements. The first element is the index, which can be one of the several

publicly available proxies for the bank's cost of funds, that is, for the current interest rate. The second element is the margin, which is a fixed percentage generally designed to cover the bank's expenses and allow for a profit on the loan. The index fluctuates with the changes in the interest rate but the margin stays constant at the level set in the HEL contract. To guarantee the consumer against unlimited rises in the APR, the agreements must provide for a ceiling which the APR cannot exceed regardless of the rise in the index, *see* 12 U.S.C. § 3806, and often also provide for a limitation on annual increases in the APR. These limitations are known, respectively, as lifetime and annual caps. As the HEL market is highly competitive, banks often attempt to attract customers by offering to charge discount APRs for an initial period of the loan ("teasers") or by reducing the margin charged to "preferred customers."

Of course, an open-end home equity loan is simply the consumer equivalent of a secured commercial line of credit. The large scale transplantation of a sophisticated commercial instrument into the consumer finance area, although generally beneficial to consumers by providing them with additional options for the management of their financial affairs, also exposes them to large additional risks: possible misinformation by the lender, possible misunderstanding of the precise terms of the loan, or just plain improvidence in assuming too great a burden of repayment (a burden which often appears more manageable than it actually is). As the consequence to a consumer may be the loss of his home, Congress decided that additional regulation of the banks' credit practices in the specific area of HELs was necessary and enacted certain amendments to the Truth in Lending Act. *See* Home Equity Loan Consumer Protection Act of 1988, Pub.L. No. 100–709, 102 Stat. 4725. The Federal Reserve Board was delegated authority to implement the amendments through promulgation of its regulations. Consumers Union claims that these regulations contradict the statute. The district court upheld all aspects of the regulations, 736 F.Supp. 337, and the Consumers Union appeals.

Consumers Union challenges six separate provisions of the regulations.

First, the Board's failure to require banks offering HELs to specify, in pre-application written materials, the current margins. The regulations instead require the bank only to remind the customer to "ask about" the current margins.

Second, the Board's failure to require banks to include the actual current margin in historical tables designed to show customers how interest rates would have fluctuated in the past under an HEL offered by the bank. The regulations permit past margins to be used.

Third, the regulation permitting disclosure of a range within which the annual and lifetime might fall; Consumers Union believes that the lender must disclose a fixed cap.

Fourth, the regulation allowing lenders to provide in HEL contracts that changes in the terms of an HEL will take place upon specified triggering events. For example, the Board allows banks to provide for an increase in the interest rate if the borrower leaves the lender's employment and also permits the lender to freeze the credit line when the APR would exceed the applicable cap.

Fifth, the failure to require lenders employing teasers to inform consumers about the interest rate over the life of an HEL. The Board required instead that the banks notify borrowers to "ask about" the discount rate.

Sixth, the Board's failure to require lenders to disclose how all possible repayment options would have been affected by changes in the index during the preceding 15–year period. The Board authorized lenders to disclose only a representative sample of options and how the consumers would have fared under representative repayment options.

The dispute between the Consumers Union and the banks offering HELs (whose position was partially adopted by the Board) might be thought to center on the flexibility that banks would have in tailoring loans to particular customers whose

high credit rating, ownership of other accounts with the bank, or other attributes, enable them to receive more favorable terms than the terms offered to the other customers. The banks did not wish to disclose in pre-application literature their actual margins (challenges (1) and (2)), or their actual caps (challenge (3)) because they wished to be free to give favorable treatment to more creditworthy customers. The banks also were concerned that a regulatory regime which eliminates their power to change the terms of the loan (even when the power to make changes upon certain triggering events was granted by the terms of the HEL contract) might expose the banks to the risk of being obliged to advance credit where it was understood at the outset of the contract that banks would not lend if the triggering events occurred. The most important power given to the banks was to withhold credit at a rate below the bank's cost of funds, as in the case of the APR going above the level of a cap. The Board's recognition of that threat in its regulations is the focus of challenge (4). And, finally, lenders were concerned that a requirement of publishing their discount or teaser rates and all repayment options would be terribly burdensome, indeed, infeasible, because discount (or promotional) rates change rapidly to stay abreast of the competition, and repayment options proliferate in response to market pressures.

Consumers Union argues that any terms in an HEL which are not disclosed in printed materials handed out by banks (called pre-application disclosures) will be less than adequate for two reasons. The customer will not be able to take home that material and pore over it at the "kitchen table." And oral disclosures such as those prompted by the "ask about" questions may be impossible to police: the statute permits a consumer to abandon a loan application without incurring liability for the application fees within three business days if the bank changes the terms of the actual loan from those disclosed to the customer at the start of the application process, *see* 15 U.S.C. § 1637a(a)(6)(B), but if the key terms at the initial stage are presented orally, it will be difficult for the consumer to demonstrate the bank's duplicity.

## II.

■ The Board's authority to issue regulations interpreting TILA is designed to enhance the purpose of the statute—to achieve "meaningful disclosure" for the consumer. Pursuant to that end, the Board is entitled to wide and respectful deference in its implementation of the statute. *See Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 101 S.Ct. 2266, 68 L.Ed.2d 783 (1981); *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 568–69, 100 S.Ct. 790, 798, 63 L.Ed.2d 22 (1980); *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973). And, of course, with respect to the interpretation of statutory ambiguities, the Board is entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In reviewing the challenge to the regulations we must always keep in mind that, as the Supreme Court has said, meaningful disclosure does not necessarily mean more disclosure. *See Milhollin*, 444 U.S. at 568, 100 S.Ct. at 798.

### 1. Margin Disclosure Regulation.

■ The Board's regulation, it will be recalled, does not require banks to disclose the actual margin in pre-application forms. The forms merely alert the consumer that the margin will be added to the index and remind him to "ask about" the actual current margin. 12 C.F.R. § 226.5b(d)(12)(iv) & (v). Appellant, however, contends the margin must be disclosed up front in pre-application forms. Appellant argues that the consumer should have the different margins charged by the banks printed in the pre-application materials so that consumers can pick the bank offering a better deal at the outset without going to the trouble of personally asking about current margins.

The relevant section of the statute requires that the consumer be told:

(B) a description of the manner in which any changes in the annual percentage rate [APR] will be made, including....

(iii) any index or margin to which such changes in the rate are related.

15 U.S.C. § 1637a(a)(2)(B)(iii).

It would appear that Congress desired that the consumer be alerted to the manner in which his interest rate would change. But as it is the index, not the margin (which is fixed), that causes changes in the interest rate, and as subsection (iii) requires disclosure of either the index *or* the margin, depending on which causes the change in interest rates, appellant's position is rather weak. We cannot say the Board's interpretation of the statutory language is unreasonable—indeed, it appears the more obvious reading.

### 2. The Historical Example Table Regulation.

██ Congress wished the consumer not only to be notified as to the index employed but also to understand how that index works so that the consumer would appreciate the possible swings in the index, and the resulting volatility of the interest rate. It therefore required the lender to provide tables which illustrate ranges of repayment schedules if various assumptions about the economy are given. One of these tables (the historical example table) involves a projection of a historical pattern of interest rates on the repayment requirements. The statute states that a historical table must be:

based on a $10,000 extension of credit, showing how the annual percentage rate and the minimum periodic payment amounts under each repayment option of the plan would have been affected during the preceding 15–year period by changes in any index used to compute such rate.

15 U.S.C. § 1637a(a)(2)(G).

The Board's regulation permits lenders, in preparing the historical table, to use any margins and discounted initial rates that have been actually employed by the bank within the six months preceding preparation of the disclosure and inform the customer that the margin or premium has been used recently by this lender. 12 C.F.R. § 226.5b(d)(12)(xi); Comment 5b(d)(12)(xi)–3. Appellant, once again, argues that the statute requires that the historical example table be based upon the actual margin used at the time of disclosure and we, once again, reject the argument. The statutory language does not mention the word "margin." It refers only to changes in the index and as we have already noted, the margin itself neither changes nor affects the index. Moreover, the Board reasonably determined that the purpose of this statutory provision would not be advanced by requiring use of current margins. This table is designed to demonstrate to the consumer the effect that swings in general interest rates can have on a repayment schedule. For that purpose, it makes little difference whether the bank uses its present margin (and discount rate, if offered) or a recent one. Indeed, as the Board argues, the use of the actual present margin might lead the consumer to place too much weight on the historical tables, treating them as a forecast rather than just an example. The effect of differing disclosure on a consumer is exactly the sort of Board determination as to what constitutes meaningful disclosure under TILA to which we must grant a great deference in the absence of an explicit statutory command. *See Milhollin*, 444 U.S. at 568, 100 S.Ct. at 798.

### 3. Annual and Lifetime Rate Caps Regulation.

██ The statute says that lenders must disclose:

(E) a statement of the maximum amount by which the annual percentage rate may change in any 1–year period or a statement that no such limit exists;

(F) a statement of the maximum annual percentage rate that may be imposed at an time under the plan.

15 U.S.C. § 1637a(a)(2)(E) & (F).

The Board's regulation provides that lenders may meet this statutory requirement for disclosure of the annual cap by stating a range of caps, *see* Comment 5b(d)(12)(ix)–3. This, of course, gives

banks the flexibility to respond quickly to market pressures by changing the cap within the range without having to re-issue all of its pre-application materials when the competitive conditions change the cap. The consumer is instructed to ask about the cap applicable in his own case, which is, of course, bound by the high end of the range. The high end of the range becomes, in effect, the maximum cap. Appellant claims that disclosure of the range is inadequate and that only disclosure in the pre-application materials of the actual cap to be offered to the customer satisfies the statute. But because the statute calls for disclosure of the maximum amount by which the annual percentage rate may change, it is hard to see why disclosure of the figure at the upper end of the range does not satisfy the statute's literal meaning. Consumers Union contends, however, that the range is not really meaningful; the customer is only interested in the annual cap on the loan at the time the loan would be negotiated. We see the force of appellant's argument, but the Board believes that prompting the consumer to ask about the currently used cap, combined with disclosure of the range, will afford more meaningful understanding. It may well be that many consumers' eyes would glaze over reading the disclosure forms that Consumers Union advocates while prompting the consumer to ask about a specific subject will cause greater attention to the issue. At any rate, we must defer to the Board on this sort of question.

*4. The Change in Terms Regulation.*

■ The Act limits the lender's freedom to impose changes in the HEL's terms without the borrower's consent. It reads:

No open-end consumer credit plan under which extensions of credit are secured by a consumer's principal dwelling may contain a provision which permits a creditor to change unilaterally any term required to be disclosed under section [1637a(a)] or any other term, except a change in insignificant terms such as the address of the creditor for billing purposes.

15 U.S.C. 1647(c)(1). The Act then provides for seven specific exceptions to the no-unilateral-change language, *see* 15 U.S.C. § 1647(c)(2).[1]

The regulation states that lenders are permitted to "provide in the initial agreement that specified changes will occur if a specified event takes place (for example, that the annual percentage rate will increase a specified amount if the consumer leaves the creditor's employment)." 12 C.F.R. § 226.5b(f)(3)(i). The Board's regulation does ban general reservation of rights clauses that would give a lender *carte blanche* to change terms of the loan at will. *See* Comments 5b(f)(3)(i)–2; 5b(f)(1)–1. As the Board explained: "Both the triggering event and the resulting modifications must be stated with specificity." Comment 5b(f)(3)(i)–1. Consumers Union contends that the Board's regulation improperly adds new exceptions not provided for by Congress. Its objection focuses on the Board's interpretation of the statutory words "change unilaterally." Consumers Union argues that the Board's interpretation simply allows the bank to demand the waiver of the consumer's statutory rights. The Board responds that the statute could not mean that the parties may not contractually provide that certain terms would change if certain specified events took place.

The question is not a simple one, because the phrase "unilateral change" in the context of this legislation is ambiguous. Its meaning—really the meaning of the word "unilateral"—depends on whether the parties when they enter into the contract are entitled to anticipate and dictate their response to certain future events. After all,

---

1. Banks are allowed, without consumer's prior agreement, to change the index and margin if the previous index ceases to be available; to freeze or reduce the credit line when the value of the home decreases "significantly," when consumer's financial status changes so as to cast doubt on his continuing ability to repay, when any material obligations are violated by the consumer, when the lender's priority is impaired by governmental action, or when the lender is precluded by the government from imposing the contractual APR; and to perform any change which is beneficial to the consumer.

the very nature of an HEL is its fluctuating interest rate, unpredictable (for the bank) schedule of credit advances, and widely varying repayment schedules. On the other hand, even the Board itself, by banning the "reservation of rights" clauses, recognizes that there is a limit to its "bilateral" argument. It appears to us, therefore, that the Board is entitled to significant leeway in determining where, along a continuum of specificity, it wishes to draw the line between unilateral changes and changes authorized by bilateral agreement.

We cannot say that they have drawn that line unreasonably. We are dealing with a disclosure statute, not one that attempts directly to affect the bargaining power of the parties. If, from the lender's disclosure, the consumer knows the exact events which will cause a change in terms, it does not seem that the statute's disclosure purpose is frustrated or even affected.

The most important of the eventualities which would cause banks to change the customers' rights, and one on which the dispute between the parties is particularly focused, is the right expressly granted by the regulation that banks may protect themselves in periods of very high inflation in which their cost of funds increase above the cap on the APR by freezing a borrower's credit line. 12 C.F.R. § 226.5b(f)(3)(i). Certainly the Board, as the agency responsible for controlling the money supply, is entitled to consider the consequences of not permitting banks to refuse to extend credit when the APR exceeds the cap. That could only occur when banks' cost of funds approaches or exceeds the cap, and to require banks to lend money even if that happens would seem to endanger not only the banks involved but perhaps the banking system itself or significant parts of it.

### 5. The Initial Discount Rate Regulation.

■ One of the more controversial lender practices upon which Congress focused is the offering of promotional discount rates ("teasers"). The risk is, of course, that the consumer will be misled and mis-

take the initial highly favorable rate for the permanent APR. To guard against such deception, Congress was quite specific and required the following pre-application disclosure:

[I]f an initial annual percentage rate is offered which is not based on an index—

(i) a statement of such rate and the period of time such initial rate will be in effect.

15 U.S.C. § 1637a(a)(2)(C).

The Board's regulations, however, provide that the lenders are required to tell consumers that the rate offered is a discount, and that it is temporary in nature, but not the rate itself. Instead, the Board requires the disclosure forms to alert the customer to "ask about the ... current discount or premium." 12 C.F.R. § 226.5b(d)(12)(v). In response to appellant's complaint that the regulations on this issue are in conflict with the precise language of the Act, the Board's counsel concedes the conflict—the "statutory language ... read literally would require the actual discounted rate [to] be provided with the early disclosure"—but relies on the Board's exception authority.

The Board is granted this broad authority in the following language:

(a) The Board shall prescribe regulations to carry out the purposes of this subchapter. These regulations may contain such classificatons, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to effectuate the purposes of [TILA], to prevent circumvention or evasion thereof, or to facilitate compliance therewith.

15 U.S.C. § 1604(a).

The Board claims that its exception power is appropriately exercised here because pre-application disclosure of the exact discount rate would not significantly add to the consumer's knowledge; the key fact disclosed is that the initial rate is a temporary discount. Furthermore, the discount rate fluctuates with competition, and it would be a heavy burden on the banks to disclose the actual terms because they

would have to print and replace new pre-application materials on a continuous basis.

As far as we can determine, this is the first case which has presented the question of the Board's use of its exception authority to contravene directly the terms of the authorizing statute. The Board itself did not rely on this added authority when it promulgated the regulation; it has been presented only by the Board's counsel. Moreover, we are quite unsure of the scope of that authority. How does the Board interpret the phrase "adjustments and exceptions for any *class* of transactions"? Does that language authorize the Board to override statutory provisions that would otherwise apply to *all* lenders? If so, for what specific purposes? We think that we are entitled—given the seriousness of interpreting a statutory provision that is asserted to give the Board authority to override the clear language of other provisions—to have the Board itself explain its position, and therefore we remand this issue to the Board. *Cf. SEC v. Chenery*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

### 6. The Repayment Option Disclosure Regulation.

■ We think our view of the discount rate issue applies also to appellant's challenge to the regulation dealing with repayment option disclosure. Typically, the repayment options offered by a lender vary a good deal and the consumer has a great deal of leeway in choosing a repayment option. Since all of the relevant terms can vary, the number of possible disclosure options appears enormous. The Act requires that the options be set out in the form of tables. The relevant language appears in three separate provisions of the statute. The first, and least troublesome provision states that the banks must disclose the repayment schedules in the form of:

An example, based on a $10,000 outstanding balance and the interest rate ... which is, or was recently, in effect under such plan, showing the minimum monthly or periodic payment, and the time it would take to repay the entire $10,000 if the consumer paid only the

minimum periodic payments and obtained no additional extensions of credit.

15 U.S.C. § 1637a(a)(9).

Sections (a)(2)(G) and (a)(2)(H) require more:

(G) a table, based on a $10,000 extension of credit, showing how the ... minimum periodic payment amount under each repayment option of the plan would have been affected during the preceding 15-year period by changes in any index used to compute such rate;

(H) a statement of—

(i) the maximum annual percentage which may be imposed under each repayment option of the plan;

(ii) the minimum amount of any periodic payment which may be required, based on a $10,000 outstanding balance, under each such option when such maximum annual percentage rate is in effect;

15 U.S.C. § 1637a(a)(2)(G) & (H).

The Board's regulations, however, require only the disclosure of three plans which the Board found to represent the general categories of existing repayment options: an "interest only" plan which requires the payment of the accrued financial charges only, a fixed-percentage of the total indebtedness plan, and other types of a minimum payment plan such as finance charges plus a specified dollar amount. *See* Comment 5b(d)(5)(iii)–2, 3.

We believe that the Board permissibly allowed the banks to present only the tables of the representative plans for the "slow motion" scenario of section 1637a(a)(9). In that scenario, the borrower chooses to pay back the minimum amount allowed by the plan, stretching out the repayment period to the maximum. The statute requires the table showing only "an example" under this scenario of the possible repayment obligations. Since disclosure of every possible repayment schedule is not required, the Board has wide latitude in choosing how the examples of the possible eventualities are to be disclosed and presented to the consumer.

The difficulty for the Board are the words "each repayment option" in sections (a)(2)(G) and (a)(2)(H)(ii). Literally this re-

quires that each repayment option would have to show the effect of historical experience with the interest rates over the last fifteen years to determine the minimum payments for worst case scenario when the rate caps are reached during the entire period as well as the maximum length of "slow motion" repayment in the "worst case" scenario. Sometimes there are hundreds of repayment options and the requirement of running each option through various contingencies would create an informational torrent of little value to the customer yet produced at a great expense to the bank. The Board's counsel concedes that the language is against the regulations and again relies on the Board's exception authority—asserting that to comply literally with sections (a)(2)(G) and (a)(2)(H)(ii) would be to overload the consumer's capacity to assimilate information. And again we remand the issue to the Board for its own explicit determination.

\*     \*     \*     \*     \*     \*

Accordingly, we affirm in part, reverse in part, and remand for further proceedings not inconsistent with this opinion.